RHEUAL W. MICKEL v. GUY A. THOMPSON, Trustee of MISSOURI PACIFIC RAILROAD COMPANY, Appellant.—156 S. W. (2d) 721.

Division One, December 12, 1941.

992

*Thos. J. Cole* for appellant.

*Mark D. Eagleton* and *Roberts P. Elam* for respondent.

994

 BRADLEY, C.—Action for damages for personal injuries. The cause was tried to a jury and resulted in a verdict and judgment in favor of plaintiff for $60,000. Motion for new trial was duly filed. On the hearing of the motion, a remittitur of $25,000 was made; the motion was overruled, and defendant appealed.

Plaintiff was a brakeman and had been employed by the Missouri Pacific for about seventeen years. He was injured while at work at Russellville, Arkansas, about 6:30 A. M., November 21, 1938. The applicable Arkansas law was pleaded. It is alleged "that on or about the said 21st day of November, 1938, while plaintiff and defendant were engaged in intrastate commerce and transportation, and while plaintiff, in the usual course of his employment by defendant, was riding on top of a certain freight car which was coupled to another car moving in a cut of cars over and along defendant's tracks at Russellville, Arkansas, defendant, his agents, servants and employees (other than plaintiff), negligently and carelessly caused, suffered and permitted the aforesaid cut of cars to become separated, directly thereby causing plaintiff to be thrown from his aforesaid position to the ground and to sustain the hereinafter described injuries and damages, when said cars collided after having been negligently separated as aforesaid."

The petition goes on to set out in detail the injuries alleged to have been sustained. The answer is a general denial. There is no claim that plaintiff did not make a submissible case, hence it is not necessary to detail the facts.

Error is assigned (1) on alleged misconduct of plaintiff's counsel; (2) on the action of the court in ruling out questions asked by defendant when no objections were made, and in not sustaining objections made to improper questions, and not instructing to disregard answers to certain questions; and (3) on an alleged excessive verdict.

It is alleged that plaintiff's counsel was guilty of misconduct (1) "in repeatedly offering in evidence alleged reports of doctors, when he knew that such reports were at most hearsay and for that reason not proper evidence;" (2) "in intimating to the jury that appellant controlled the courts and juries of the State of Arkansas; that because of appellant railroad, respondent could not have obtained a fair trial in his home State of Arkansas, and that anything the appellant touched was thus contaminated so as to cause fear to respondent's counsel;" (3) "in calling individual jurors by name and by advising one juror that he would place his hat on the hat rack, which counsel did;" and (4) in the cross-examination of defendant's witness, Middleton, conductor of the train with which plaintiff was working when injured.

In order to appreciate the assignments on alleged misconduct, it will be necessary to deal with the evidence, for the most part, as it appears in the record. Plaintiff was examined by Drs. Willis C.

Campbell and R. E. Semmes, Memphis, Tennessee, and they made separate written report of the examination made. While plaintiff's witness, Dr. Earl H. Hunt, Clarksville, Arkansas, was on the stand, the following occurred on direct examination: "Q. Do you know he (plaintiff) went over there (Memphis); went over to see Doctor Campbell? A. Yes, sir. Q. Did you, after he went over there, go over to see Doctor Campbell? A. Yes, sir, I did; I went over to talk to Doctor Campbell. Q. Have you the reports that they (Drs. Campbell and Semmes) gave you on his condition? A. I have. Q. Have you got those with you? A. Yes, sir. . . . Q. I will ask you to read to the jury, if you will. Mr. COLE: That is entirely improper, and I object to any selfserving statements produced here without the privilege of cross-examination. Mr. EAGLETON: If the Court please, I think the statements may be—Mr. COLE: I don't want any speech, Your Honor. Mr. EAGLETON: I think the objection is well taken in as far as the introduction of any statement is concerned. Mr. COLE: Yes, I submit that you should not have offered that, Mr. Eagleton. Mr. EAGLETON: I didn't know you were going to object; if you remember, at the deposition, you asked me to produce them. Mr. COLE: I said, 'Produce the doctor.' Mr. EAGLETON: No, you said to let you see them (statements) and I said I would have them at the trial. Mr. EAGLETON: I now offer in evidence the statements (of Drs. Campbell and Semmes) marked plaintiff's exhibits A and B.''

The statements of Drs. Campbell and Semmes appear in the abstract, but it does not appear that they were either passed to or were read to the jury. Plaintiff's counsel says that they were not, and from what subsequently occurred it is quite clear that these reports were not before the jury. After the incident above mentioned concerning the reports of the Memphis doctors, and when plaintiff was on the stand and under cross-examination, he was asked by defendant's counsel if Dr. Hunt had told him that he had a herniated nucleus pulposus, and answered, "yes." Then he was asked when Dr. Hunt told him, and he answered that Dr. Hunt so told him when he (Dr. Hunt) "got Doctor Campbell's and Doctor Semmes' report back from Memphis." Then defendant's counsel, in effect, asked if it appeared in these reports that he (plaintiff) had a herniated nucleus pulposus, and plaintiff's counsel interposed the objection that the reports were the best evidence. Then followed a *crossfire* between counsel, as follows:

"Mr. COLE (counsel for defendant): I object to that; this fellow (plaintiff) is trying to put something in evidence that is not in the report. Mr. EAGLETON (counsel for plaintiff): Then I suggest that the best evidence is to put them (the reports) in. Mr. COLE: No, the best evidence is to bring these fellows (Drs. Campbell and Semmes) here, or try the case in Arkansas. The COURT: I wish counsel would

content themselves with the evidence and I will sustain the objection (that the reports were the best evidence as to what was in them). Mr. COLE: Save my exception. Mr. EAGLETON: Now I am objecting on the ground that these reports are the best evidence of what they contain, and I am perfectly willing for the jury to see what they are. Mr. COLE: Who wrote them, did you? Mr. EAGLETON: No. Mr. COLE: Bring the doctors here; I want them here. Mr. EAGLETON: If you want them, go get them. Mr. COLE: No, I want them; they are your doctors, the ones you want to make your case. Mr. EAGLETON: No, they are two respectable doctors. ▆▆▆▆ Mr. COLE: That is what you say; maybe they are respectable, and maybe they are too respectable to come and testify that the man has a herniated nucleus pulposus. Mr. EAGLETON: Show what are in the reports. Mr. COLE: I don't care to see anything prepared in your office. Mr. EAGLETON: They are prepared by Doctor Semmes and Doctor Campbell. Mr. COLE: You don't even say that you didn't see them made. Mr. EAGLETON: I object to that; I am not on the stand. Mr. COLE: I object to that; if he wants the testimony of these doctors he should bring the doctors into court. The COURT: I'll say this is not proper procedure and both of you seem to go outside of that procedure.''

The *crossfire* was in the presence of the jury, and upon its termination the following occurred out of the presence of the jury: ''Mr. COLE: At this time I ask for a mistrial in this case in view of the manifest improper things that have happened here, and I'll ask for a mistrial, I don't think I can have a fair trial before this jury because Mr. Eagleton intimated to me that in keeping these reports out I am doing something that is not proper, and Mr. Eagleton has tried to get into this record the contents of these reports, and they are *not proper evidence* (italics ours), and he has intimated that they say this man has a herniated nucleus pulposus, and I say to the court that they don't say any such a thing.

''Mr. EAGLETON: If the court please I want the record to show that the motion made by defendant's counsel was the first thing that was made outside of the presence and hearing of the jury, and that prior to that time he was the one that was guilty of gross misconduct and impropriety in lecturing counsel, and he is the one that brought up the subject of these reports by asking the witness, by saying to the witness, in effect, the reports did not contain any mention of herniated nucleus pulposus, and I made the objection that the reports were the best evidence of what they did contain. . . .''

Defendant's request for a mistrial was refused and exception saved. ▆▆▆▆ There was no adverse ruling on, and no exception to what occurred at what we may call the first incident pertaining to the suggested reading of the reports of Drs. Campbell and Semmes, of which defendant complains. In the situation there is no point for review. [Osby v. Tarlton, 336 Mo. 1240, 85 S. W. (2d) 27, l. c. 31, and

cases there cited.] And as to the second incident, defendant is in no position to complain, because such resulted from defendant's counsel asking plaintiff if it appeared in the reports of Drs. Campbell and Semmes that he (plaintiff) had a herniated nucleus pulposus. And it appears from the *italics* in defendant's request for a mistrial that counsel *concedes* that the reports would be the best evidence as to their contents. That, of course, is elementary, and if that concession had been made when objection was made on that ground, the second incident pertaining to the reports would probably not have occurred. In the situation defendant is in no position to complain as to the second incident or the refusal of the request for a mistrial.

Defendant complains that plaintiff's counsel was guilty of prejudicial misconduct in intimating to the jury that defendant controlled the courts and juries of Arkansas, and that plaintiff could not have had a fair trial in his home state. This complaint is based on what occurred during the direction examination of plaintiff's wife, Lillian Mickel, but the background was in the cross-examination of Dr. Hunt, plaintiff's witness. Defendant's counsel, on the cross-examination of Dr. Hunt, made inquiry as to the medical services he had rendered plaintiff and what charges he had made. Dr. Hunt stated that he had seen plaintiff twice a week, but his books did not show that charges were always made twice a week, and he was asked about this, and answered: "The boy was out of work, and he didn't have any money, and I said to the nurse (in Dr. Hunt's office, as we infer), 'I don't think the boy can ever pay anything.' . . . Q. What do you mean he couldn't pay anything, he owns thirty-six lots down there (Clarksville, Ark.) and he is getting sixty dollars a month from the insurance company, and his wife has a studio? A. Thirty-two lots in Clarksville, I wouldn't give him thirty-two cents for it. Q. Answer the question? A. I don't know whether he has thirty-two lots in Clarksville, but I have more than thirty-two lots and I'll trade him sight unseen and I don't know where his are. Q. They are worthless? A. Absolutely. Q. You don't have to pay any taxes on them? A. They charge me taxes, I would like to get rid of mine. Q. Did you make any investigation to find out what money he had when you say the reason you didn't send him a bill you knew he didn't have anything? A. No, I never investigated anything, I don't care, I have a living without it. Q. What about this photograph studio, doesn't that belong to her (plaintiff's wife) down there? Mr. EAGLETON: I object to that, the fact that his wife is interested in a studio. Mr. COLE: She owns it. Mr. EAGLETON: I think she has some interest in it, I'll put the woman on the stand and let you ask her about it. Mr. COLE: You do know they had property? A. No, I know the home they are living in that this girl built and bought before she married, but whether he has ever paid her and her brother for it I don't know. Q. Do you know whose

name that home is in? A. No, sir. Q. You didn't know he owned these lots? A. No, and I rather doubt it now. Q. Did you know he was getting sixty dollars a month from the insurance company? A. I do, because I filled out the blanks every thirty days."

When plaintiff's wife was on the stand she testified as follows: "Mr. EAGLETON: Do you know what the value of your interest in that business (studio) is? A. Fifteen hundred dollars. Q. Fifteen hundred dollars? A. Yes, sir. Q. Now, has that amount of interest, has that been bought and paid for by you? A. No, sir. Q. How much has? A. Four hundred dollars. Q. You owe the rest of it? A. Yes, sir. Q. Now, Mr. Cole mentioned the fact that you or your husband owned thirty-six lots in Clarksville, I will ask you if it is a fact, or not? A. No, sir. Q. How many lots do you own? A. To be exact, twenty-seven. Q. Twenty-seven lots? A. Yes, sir. Q. And what is the value of those lots, please? A. Two of them one hundred and fifty dollars each. Q. One hundred and fifty dollars each? A. Yes, sir. Q. What's the value of the others? A. From five to ten dollars. . . . Q. There has been mentioned further that there is a home, what is that home, what's the value of the home with the ground upon which it is located? A. Fifteen hundred dollars. Q. Is that bought and paid for? Mr. COLE: I suppose we are going to go into collateral matters. Mr. EAGLETON: We will have to prove a lot of them, if you want to bring them out. You were not satisfied when the answer was made about the thirty-six lots and trying to make the jury believe that here is a man that is rolling in wealth. Mr. COLE: He has plenty, but if they ask her about it we want the privilege of going into it ourselves. Mr. EAGLETON: Oh, yes, you can go into it. Mr. COLE: If you had a jury of Arkansas people go into it—Mr. EAGLETON: I prefer to go into it where I can get a fair chance, I am afraid of anything your railroad does. Mr. COLE: You are afraid of it? Mr. EAGLETON: I am afraid of anything you people touch."

No objections were made by defendant, hence again there is nothing to review.

■ Complaint is made on the alleged ground that plaintiff's counsel attempted to get too friendly with the jurors. There is nothing in the *record* to show what counsel's conduct towards the jury was except in defendant's motion for a new trial, and the motion cannot prove itself. [Middleton v. Kansas City Public Service Co., 348 Mo. 107, 152 S. W. (2d) 154, l. c. 158; Sennart v. McKay (Mo.), 56 S. W. (2d) 105, l. c. 109; Engleman v. Railway Express Agency, 340 Mo. 360, 100 S. W. (2d) 540, l. c. 544.]

■ The fourth and last complaint on alleged misconduct, as stated, relates to the cross-examination of F. Middleton, conductor of the train with which plaintiff was working when injured. Defendant says that the questions were "designed only to secure sympathy of the jury." Plaintiff's counsel asked Middleton if plaintiff had

"been a good worker all the time," and answered, "Yes, sir." Then Middleton was asked if, prior to injury, plaintiff "moved [726] around with alacrity and dispatch, and did a good hard day's work, and was clear and alert on the job." The answer was "Yes, sir." Defendant objected to each of these questions, was overruled, and saved exception. To the first of these questions the ground of objection was that it was "highly improper;" had "no bearing on the case." And the objection to the second question was that it "had no bearing on the case at all." The objection in each instance came after the answer. Defendant asked the court "to instruct the jury to disregard" the answer that plaintiff was a good worker, was refused, and excepted. There was no request to disregard or strike the answer to the inquiry as to how plaintiff, prior to injury, "moved around," etc. Having failed to request to instruct to disregard or to strike the point on the second question is not before us. [Harrison v. St. Louis-San Francisco Ry. Co., 339 Mo. 821, 99 S. W. (2d) 841, l. c. 843, and cases there cited.]

We do not think that the evidence that plaintiff was "a good worker all the time," even though not material and not proper, was of sufficient consequence to justify reversal and it would seem that defendant did not regard such very seriously. Defendant put on the stand C. A. Menea, a brakeman in the crew when plaintiff was injured. On cross-examination, Menea was asked if plaintiff "was a strong and vigorous worker," and without objection, answered, "Yes, sir." It is true that one does not, in order to be heard on appeal, have to continue to object to the same character of questions, but the difference between the questions was, we think, sufficient to suggest objection to the question asked Menea, if such evidence was seriously regarded as prejudicial.

Defendant complains that the court erred in ruling out questions when no objections were made by plaintiff, and in failing to sustain objections to improper questions, and in failing to instruct to disregard answers to certain questions.

Under these assignments, defendant points out, in the record, three instances in which error is claimed. These follow:

(1) When plaintiff was on the stand this occurred. "Mr. COLE: Why didn't you bring suit in your home county? The COURT: That is argumentative. Mr. COLE: I object and except to the remarks of the court; there is no objection to that question. Mr. EAGLETON: I don't care to object to that; he can answer the question." Plaintiff asked what the question was, and Mr. Cole restated it as follows: "Q. Why didn't you bring suit in the county where you knew everybody, where you had grown up as a young man, and where your father lives, and your brother lives; you discussed that, didn't you?" Then followed another *crossfire* between counsel, and plaintiff finally stated that he turned his case over to Mr. Eagleton, and that it was Mr. Eagleton's "privilege to file it where he saw fit."

(2) When plaintiff's wife was on the stand, Mr. Cole, on cross-examination, asked if she knew how much her husband was suing for, and answered that she heard what the amount was. Then she was asked who told her, and said that Dr. Hunt and Mr. Beedy (claim agent) told her. Then she was asked to tell the jury "how much" it was, and answered that it was $60,000. Then the following occurred: "Q. Did you hear him (plaintiff) say how much he wanted? Mr. EAGLETON: I object to that, if the court please; we will be glad to tell him if he wants to know. The COURT: The objection will be sustained. Mr. COLE: Save my exceptions. Mr. EAGLETON: I'll withdraw the objection; go ahead and answer the question. The COURT: The court will sustain the objection; he doesn't want this witness to answer that question."

(3) In the cross-examination of plaintiff as to what occurred on the occasion of his injury, the following occurred:

"Q. He (brakeman Butler) did tell you he pulled the pin? A. Well, not in time. Q. Why didn't you tell the jury that; I asked you if he told you, before the accident occurred, that he had pulled the pin, and you said he didn't? A. Not to the extent it meant anything. Q. In other words, you were told, but you say you didn't have enough notice of it? A. That's right. Q. I will ask you again if you didn't tell Butler to do this very thing, and have ▆▆▆ the agreement, on the ground, that Butler was to do it? A. I never done it. Q. And you had changed your mind about it? A. No, sir, I didn't. Q. And if you didn't tell the engineer, the man that held you in his arms, that the whole thing was caused by the fact that you got the signals confused? A. No, sir. Q. You say you didn't have that conversation? A. No, sir, I never done it. Q. Would he have any reason to lie about it? Mr. EAGLETON: I object to that question, it is improper. The COURT: The objection will be sustained. Mr. COLE: Save my exceptions."

Able counsel fails to direct our attention to any authority that would support a reversal on either or all of the three instances mentioned. Manifestly, there is no substantial merit to these assignments.

▆▆ Is the judgment excessive? As stated, the verdict was for $60,000, but there was a remittitur of $25,000, leaving the judgment at $35,000. Defendant, in effect, says that the verdict was not only excessive, but was so excessive as to indicate passion and prejudice on the part of the jury. Dr. Earl H. Hunt, Clarksville, Arkansas, treated plaintiff from the day of his injury, and testified: "He was suffering so I couldn't give him a thorough examination; he was sore and had a cut chin, and shoulder hurt, and knees and back and hip, and his abdomen was distended; I didn't want to turn him over because I didn't know he wasn't hurt internally, he had such a jar, such a stop when he came off of the car and hit the ground, he stopped so sudden I thought he might have torn something loose internally.

1002

He was confined there, from that day for some months. . . . I saw him quite frequently; he suffered quite a lot and we would have to give him hypodermics. . . . I had to see him several times; I saw him there in his home for two or three or four weeks. . . . We sent him to the Missouri Pacific Hospital at Little Rock. . . . The left shoulder, and the left elbow, and the left knee were bruised, one knee was swollen up twice as large as the other. . . . He had an awful bruised place on his left hip. . . . Q. And I think the evidence will show that he was at the hospital at Little Rock and St. Louis on five different occasions . . . beginning a little after Christmas in 1938, down to February, 1940, now did you continue to give him therapy when he came home between those hospital visits? A. Yes, sir. . . . In the lower back, in what you call the lumbar region, in the lower part below the waist line, clear down to the tail bone, he was very tender and sore all the time in the back region. . . . When I tried to move the back the muscles would draw, what we call spastic condition and when that pain would hit he goes into a spasm, and he had the knee jerks, and he had, and still has, a loss of sensation in what we call the saddle region, the part of the anatomy that touches the saddle when you ride a horse, over the region of the privates, and from the groin up to the middle part of the back. . . . I found that he has a loss of sensation, that is to prick him with a pin or pinch him in that saddle region he doesn't feel it, or to stick him with a pin, or pinch him out here (indicating) he has feeling, but in the region in the lower abdomen and the saddle region, he has loss of sensation, it is not totally lost, it is a definite diminished loss of sensation. . . . At the end of the lumbar sacro joint; the lumbar back is divided into sections and the lumbar, the back bones, they call them the lumbar, the lower five, and it goes into the sacrum; the sacrum is a flat bone that joins with the pelvic or rim bones that the leg bones pivot in, and it apparently was the fifth lumbar, between the lumbar and the sacro bones. . . . My diagnosis is rupture of the disc between these two back bones. . . . A rupture of that disc is just like a cut, a cut in the outer covering of a car tire and the inner tube bulges out, that is a rupture. . . . A hernia of this disc between the fifth lumbar and the first sacrum. Q. Doctor, is that injury that you have described there, is that a painful injury? A. Yes, sir, it is very painful. Q. Is that an injury which, as far as the performance of manual labor is concerned, is it a disabling injury? A. Yes, sir, he cannot lift, any time they bend over it pinches that nerve and that is like being stuck with a knife. Q. Is he, at this time, disabled from the performance of manual work, in your judgment? A. He is. Q. I will ask you to state, in your opinion, whether or not that disability is of a permanent nature, or not? A. It is permanent.''

Dr. F. G. Pernoud, who had been connected, in the surgical capacity, with a number of hospitals, and "taught surgery in the Washington University," and whose qualifications were admitted by defendant, examined plaintiff March 19, 1940, and November 1, 1940 (trial commenced November 4, 1940). Dr. Pernoud, as a witness for plaintiff, testified:

"There was a tenderness, under pressure, over the lumbar sacral joint, that is pressure over this joint, that is the joint between the pelvis and the spine, particularly on the right side, was tender on pressure. Now there was atrophy, or wasting, of both hips and both legs, and that was particularly true to the left hip and on the left thigh and left leg. They were smaller than normal and the muscles are somewhat wasted. There's an atrophy, or wasting, of the left buttock muscle and on slight strain this left buttock muscle becomes spastic and jerky. . . . The coccyx, or tail bone, is deflected to the right. . . . Now I went over the question of sensation, pin prick sensation of the hips, thighs and legs and I found a partial anesthesia, there is a partial numbness, particularly of the skin of his thighs and legs, and I found this anesthesia particularly more in the crotch area, or the area sometimes known as the saddle area. . . . It was my opinion that this man had suffered, and is at the present time, suffering from damage to the nerve structure in the neighborhood of the lumbar sacral joint. . . . The nerve structures have been either damaged by a displaced disc between the fifth lumbar vertebra and the top of the sacrum, or the central part of that disc has been exploded, in the spine, but either one of these two conditions occurred and retraced their steps, but at the same time left damage to the nerve structures within the spine. Q. Is that character of damage that you found there a painful condition? A. It is. Q. Is it one that disables a person who suffers it, that performs manual work? A. It does. Q. Assuming that he has suffered pain from the time of his injury on November the 21st, 1938, almost two years ago, down to date, in that region, would you say that he is reasonably certain to continue to suffer pain in that region in the future? A. It is my opinion that he will."

Several physicians testified as witnesses for the defendant, but it could serve no good purpose to detail their evidence. According to defendant's medical evidence, plaintiff's injuries were not very serious. The jury, however, was the sole judge of the weight of the evidence and credibility of the witnesses.

At the time of plaintiff's injury, he was in good health; was thirty-six years old, and was earning about $2250 per year. "It is generally held in State courts that 'where future payments are to be anticipated and capitalized in a verdict, the plaintiff is entitled to no more than their present worth.' " [Gill v. Baltimore & Ohio R. Co., 302 Mo. 317, 259 S. W. 93, l. c. 97.] The present worth of an annuity of $2250,

measured by plaintiff's age, under Sec. 3522,.R. S. 1939, 7 Mo. Stat. Ann., sec. 3132, p. 5174, is $28,046.25, which is almost $7000 less than the judgment after the remittitur. The calculations under Section 3522 are based on interest at six per cent, and plaintiff contends that under present economic conditions, present worth calculations should be based upon a lower rate of interest, and cites the Gill case, supra, to support such contention, and it is stated in the Gill case (259 S. W. l. c. 97) "that a somewhat low rate of interest is to be employed in computing the capitalized value of future installment payments." But it must not be overlooked that the table in Section 3522 is based upon annuities of a sum certain and for a definite duration, and requiring no effort upon the part of the recipient, while future earnings of plaintiff could not be definite in amount or duration, besides the fact that such earnings, if plaintiff continued to receive them for his expectancy, would require work and labor. Such, we think, should not be overlooked in dealing with the vexing question of excessive damages. Also, there is the rule that "when the facts as to the injuries inflicted and losses sustained are similar, though never identical, there should be a reasonable uniformity as to the amount of verdicts and judgments in the various cases." [O'Brien v. Rindskopf et al., 334 Mo. 1233, 70 S. W. (2d) 1085, l. c. 1093; McNatt v. Wabash Ry. Co., 341 Mo. 516, 108 S. W. (2d) 33, l. c. 43; Philibert v. Ansehl Co., 342 Mo. 1239, 119 S. W. (2d) 797, l. c. 804; Murphy v. Fred Wolferman, ▪▪ Inc., 347 Mo. 634, 148 S. W. (2d) 481, l. c. 489.]

Another rule, often referred to, is that appellate courts should not disturb a verdict for damages on the theory that it is excessive, unless it is apparent from the record that the verdict is grossly excessive. [McNatt v. Wabash Ry. Co., 341 Mo. 516, 108 S. W. (2d) 33, l. c. 43.]

Plaintiff contends that $35,000 damages are not excessive, and in support of this contention, calls our attention to the cases presently mentioned. The injuries in these cases were not the same, and not the same as in the present case, but in each case the plaintiff was totally and permanently disabled from doing manual labor, as was plaintiff in the present case. To set out the evidence as to the injuries in these cases would unduly extend this already too lengthy opinion. In Bond v. St. Louis-San Francisco Ry. Co., 315 Mo. 987, 288 S. W. 777, the plaintiff was thirty-seven years of age when injured; annual earnings were $2300. He got a judgment for $50,000. This was reduced on appeal to $35,000. In Span v. Jackson, Walker Coal & Mining Co., 322 Mo. 158, 16 S. W. (2d) 190, the plaintiff was thirty-six years of age when injured; annual earnings were $2000. It was held that $50,000 was not excessive. In Rose v. Missouri District Telegraph Co., 328 Mo. 1009, 43 S. W. (2d) 562, the plaintiff was thirty-one years of age; earnings were $5 per day. It was held that $40,000 would not be excessive. In Aly v. Terminal R. Assn., 342 Mo. 1116, 119 S. W. (2d) 363, the plaintiff was forty-two years of

age; earnings were $214 per month. It was held that $40,000 would not be excessive.

Defendant, in effect, says that plaintiff was not injured at all; that "the trial was a travesty on justice;" that "the so called remittitur is a blind guess;" that "there is no real proof of real injury." But defendant makes no effort to point out the evidence to support these assertions. There were sixteen doctors who were witnesses; seven were called by plaintiff and nine by defendant. About 175 pages of the record are taken up by the evidence of these doctors, yet on the assignment, based on excessive judgment, defendant, in the brief, devotes scarcely more than a page.

"The question of excessiveness of the verdict must be considered from somewhat the same angle as a demurrer to the evidence—all the evidence tending to support the verdict must be taken as true." [Peterson v. Kansas City, 324 Mo. 454, 23 S. W. (2d) 1045, l. c. 1049; Webb v. Missouri-Kansas-Texas R. Co., 342 Mo. 394, 116 S. W. (2d) 27, l. c. 30.]

In West v. Kurn et al. (Mo.), 148 S. W. (2d) 752, the damages were reduced from $45,000 to $35,000. In that case the plaintiff was a member of a switching crew; was thirty-six years old at time of injury, and his annual earnings were $200 per month. "He sustained a fracture of the jaw, which prevented his teeth from closing and meeting properly, a fracture of one or more ribs, and a comminuted or splintered compression fracture of two or more vertebrae of the spine at the twelfth dorsal level. Fracture of the spine was such that the body of one of the vertebrae was crushed into a wedge shaped piece and caused to protrude rearward into the spinal canal, and the posterior portion of these vertebrae, which cover the spinal cord, known as the laminae of the vertebrae, was fractured, resulting in bony impingement upon the spinal canal, which caused fracture or lesion, and tight compression of the spinal cord and injury or lesion to the cauda equina (the lower termination of the spinal cord), consisting of the aggregated sacral and coccygeal nerves; and involvement of the nerve roots by particles of bone from the fractures. Plaintiff was in defendants' employees' hospital at St. Louis for over six months, with the exception of one or two brief periods of about a week each during the summer. For several months he was completely paralyzed from the waist down, but that paralysis partially subsided thereafter. During this time he had no control of his urine, and a catherization tube was kept in him continuously, and he likewise had no control of his bowels. He was at first completely encased in a plaster case from his armpits to his hips and later was kept stretched out on a fracture bed by means of weights and extensions applied to his body. He suffered severe and continuous pain."

The injuries in the present case are not, we think, as serious as in

1006

the West case, and not as serious as in the other cases, *supra,* where damages for $35,000 or more were approved.

If the rule as to uniformity in the amount of verdicts is to be maintained, we think that the damages in the present case should be reduced to $25,000. Therefore, if plaintiff will, within ten days from the filing of this opinion, enter here a remittitur of $10,000, the judgment for $25,000 will be affirmed. Otherwise, the judgment will be reversed and the cause remanded. It is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.