Marie LONG (Plaintiff), Respondent,

v.

ST. LOUIS PUBLIC SERVICE COMPANY, a corporation, and Leonard May, Defendants,

St. Louis Public Service Company, a corporation (Defendant), Appellant.

No. 29266.

St. Louis Court of Appeals.

Missouri.

March 20, 1956.

Motion to Modify Opinion and for Rehearing or for Transfer to Supreme Court Denied April 13, 1956.

Opinion Modified on Court's Own Motion April 13, 1956.

John E. Bardgett, St. Louis, Lloyd E. Boas, St. Louis, of counsel, for appellant.

Charles A. Lee, Jr., St. Louis, William F. Sindel, St. Louis, of counsel, for respondent.

ANDERSON, Presiding Judge.

This is an action by Marie Long, as plaintiff, against the defendants, St. Louis Public Service Company and Leonard May, to recover damages for personal injuries alleged to have been sustained by plaintiff on March 24, 1952, while a passenger on a motorbus of defendant Public Service Company, as a result of a collision between said motorbus and an automobile being driven by defendant May. The trial below resulted in a verdict in favor of defendant May and in favor of plaintiff, and against defendant Public Service Company in the sum of $4,500. From the judgment on this verdict defendant Public Service Company has appealed.

The case was pleaded and submitted against defendant St. Louis Public Service Company on the theory of res ipsa loquitur, the petition alleging that said defendant did "negligently and carelessly

cause and permit said motorbus to strike and collide with an automobile being controlled and operated by defendant Leonard May. Specific charges of negligence were pleaded against defendant May, but the cause was submitted only on one of them, namely, failure to keep and maintain a constant, careful and vigilant watch and lookout ahead and laterally for other vehicles and, in particular, the motorbus of defendant St. Louis Public Service Company.

■ Appellant contends that the court erred in overruling its motion for a directed verdict, for the reason that plaintiff's own evidence shows the specific cause of the collision, and shows that defendant Public Service Company was not negligent. This necessitates a review of the evidence, considered in its most favorable aspect to plaintiff's case.

Plaintiff boarded appellant's bus at the corner of Cass Avenue and Hadley Street at about 3:40 p. m., intending to go to Eighth and Olive Streets in the downtown district. She was unable to secure a seat at the time, consquently stood in the aisle. She stated that she stood "about the first seat after that long seat in the bus." She was facing west as the bus proceeded south on Eighth Street. She held on to a rail with her right hand. In her left hand she carried a purse and a small package. The bus arrived at the intersection of Eighth Street and Washington Avenue about 3:50 p. m. There is a stop sign on Eighth Street located at about the building line. The bus stopped at this sign to unload and take on passengers. It then started forward. It started "fast", according to plaintiff. When the bus started into Washington Avenue plaintiff saw two automobiles approaching Eighth Street from the west. These automobiles did not appear to plaintiff as traveling very fast. Plaintiff could not estimate their speed. Plaintiff admitted that in a deposition taken before trial she had testified the automobiles were traveling at a moderate rate of speed, and that a moderate rate of speed to her would be perhaps 15 or 20 miles per hour, though

she was no judge of speed. She then testified:

"Q. If it was your estimation at that time, is it your estimation at this time? A. Perhaps it would be. I won't say for sure. I don't drive. I don't know speed when I am riding. * * * The cars were traveling close together, one behind the other."

Plaintiff was unable to estimate the distance between the automobiles. Both cars were traveling at about the same rate of speed. The bus traveled faster than the automobiles. The cars were in the south or eastbound streetcar tracks. When asked how far the cars were from Eighth Street when she first saw them, plaintiff replied: "I couldn't say. I am no judge of distance."

It was after the bus had proceeded into Washington Avenue for some distance that plaintiff was injured. She testified:

"Well, there was a terrible jolt, and a lady standing next to me fell on me, fell against me. * .* *... I was thrown up against the coin box and down into the foot step. * * .* I was crouched down in that step.

* * * * * *

"Q. Do you know whether there was an impact between either one of those cars and the bus? A. Well, there was something.

"Q. There was something that caused this terrible jolt? A. Yes.

* * * * * *

"Q. One of these automobiles later hit the bus, didn't it? A. I don't know if it hit the bus or what happened.

"Q. You don't know whether there was a collision? A. There was a terrible jolt that throwed me.

"Q. Did you hear a crash? A. Yes, I did.

"Q. Did you see the automobile hit the bus? A. I didn't see him exactly hit it. * * * All I remember that

I could see was these cars coming down Washington and all of a sudden there was a terrible jolt, and the lady standing next to me she threw me—I lost my balance and was thrown against the coin box.

\* \* \* \* \* \* \*

"Q. At the time you felt this jolt—you don't know whether the bus was hit or not, is that right? A. No, I don't.

. \* \* \* \* \* \* \*

"Q. And which one of these cars was in collision with the bus, do you know? A. The second one.

"Q. It did hit the bus, did it? A. I don't know that it hit the bus. I might not understand you very clearly. \* \* \* I can't say that it hit the bus. \* \* \* All I know, there was a terrible jar and I was thrown down."

Plaintiff further testified that she recalled testifying in her deposition that the second car hit the bus, and in explanation stated: "I am just going by what the people said."

It appears from the testimony of Officer Harry Rennekamp, who was plaintiff's witness, that there was a collision between the bus and an automobile being driven by defendant May. Rennekamp was at the time standing on the southwest corner of the intersection. He was not facing the intersection at the time, hence did not see the collision. He heard the crash of the collision, then turned around and observed the vehicles in contact. In his report, the officer fixed the place of collision as 10 feet north of the southwest corner of the intersection and four feet east of the west crosswalk. Plaintiff's testimony put the front of the bus halfway between the south rail of the streetcar tracks and the south curb of Washington Avenue at the time of the crash. The bus was headed south. The point of impact on the bus was at the front door. Washington Avenue is 60 feet in width. There were no major street stop signs at Eighth Street for traffic moving east and west on Washington Avenue. Eighth Street was a one-way street.

Mary King testified on behalf of plaintiff. She was a passenger on the bus at the time and was seated in the first seat behind the long seat on the west side of the bus. She saw two or three people thrown to the floor. She herself was thrown to the floor. She saw plaintiff thrown forward into the stairwell. Mrs. King further testified that she saw two or three automobiles, including the car that hit the bus, coming down Washington Avenue. The car that hit the bus was about 30 feet away when she first saw it. It was in the eastbound streetcar tracks. When she first saw this car the bus was about in the middle of Washington Avenue. It was going about nine miles per hour. She could not estimate the speed of the car when she first saw it. She stated that as far as her knowledge was concerned the car did not swerve from the time she first saw it until the impact. She could not say whether or not the speed of the car was slackened. The rear end of the bus was in the streetcar tracks at the time of the collision. On direct-examination Mrs. King testified that she saw the car hit the bus, and that the point of impact was at a point on the bus directly behind the seat of the bus on which she was sitting. On cross-examination she testified that she did not know of her own knowledge that the car ran into the bus.

It is appellant's position that plaintiff, by her evidence, showed facts and circumstances which conclusively repelled any inference of negligence on the part of appellant, and at the same time proved that the collision in question was due solely to the negligence of defendant May.

There can be no doubt of the general proposition that if a plaintiff, in making out a case of specific negligence against one joined as a co-defendant with a carrier charged under the res ipsa loquitur theory, produces evidence which conclusively shows that the negligence of the one specifically charged was the sole cause of the accident, no recovery can be had against the carrier on any theory of liability. Rothweiler v. St. Louis Public Service Co., Mo.App., 224 S.W.2d 569. Likewise, no recovery

can be had where a plaintiff, after making a prima facie case under the res ipsa loquitur doctrine, goes further and produces evidence which repels any inference of negligence on the part of the operator of the vehicle involved in the accident. Niklas v. Metz, 359 Mo. 601, 222 S.W.2d 795; Heidt v. People's Motorbus Co. of St. Louis, 219 Mo.App. 683, 284 S.W. 840.

In addition to making a prima facie case under the res ipsa loquitur doctrine, plaintiff offered considerable evidence with respect to the movements of the bus and the automobile of defendant May just prior to the collision, but this evidence was not developed to the point where it proved conclusively that the bus driver was at all times in the exercise of the highest degree of care and not guilty of negligence. It appears from the evidence that the bus entered the intersection and attained a speed of nine miles per hour. It proceeded across the intersection with undiminished speed until it came into collision with the automobile of defendant May. It does not appear from the plaintiff's evidence whether the bus driver, when he entered the intersection or thereafter, took the precaution to look to the west for approaching traffic. At some point prior to the accident it must have become apparent that a collision was imminent, for it appears that the automobile was for some time prior to the collision proceeding toward the path of the bus with undiminished speed. Yet there is no explanation why the bus driver was unable to avert a collision, either by stopping, swerving, or checking the speed of the bus.

In our judgment the evidence falls far short of proving conclusively that the bus driver was at all times in the exercise of the highest degree of care, and that the plaintiff's injuries were caused solely by the negligence of defendant May. It was, therefore, quite proper to submit the case against appellant under the theory of res ipsa loquitur. The court did not err in overruling appellant's motion for a directed verdict. Rothweiler v. St. Louis Public Service Co., 361 Mo. 259, 234 S.W. 2d 552.

Appellant's next point is that the verdict against defendant Public Service Company cannot stand because it is based upon the testimony of defendant May, which testimony is not available to plaintiff for the reason that it is at war with plaintiff's theory of the case, and contrary to her own personal testimony.

The testimony of May, who testified in his own behalf, was: "I was coming east on Washington Avenue, driving approximately fifteen to sixteen miles an hour, because I was going to make a right turn into Eighth Street. * * * About fifteen to eighteen feet before we approached the intersection of Eighth Street I glanced and saw the bus pull out of the intersection at Eighth and Washington * * * I started to make my righthand turn into Eighth Street, and at the same time in doing so a lady stepped down off the curb that had been standing there, causing me to have to move the front end of my car just a fraction and stop at the same time. At that very instant the bus caught the left headlight rim * * * jerking my light completely out onto the ground."

Defendant May further testified that when he was 15 or 20 feet from the intersection the bus was moving and already past the boulevard stop sign. He stated:

"I would say the front end of his bus was in the pedestrian crosswalk across Eighth Street * * * I automatically figured my right turn would be clear before he ever reached the intersection on the other side. * * * I would say he was running in the neighborhood * * * I would have judged him somewhere around eight miles an hour.

* * * * * *

"Q. What part of the bus struck your car? A. I presumed it was just at the front edge of the front door or the back end of the door, one of the two.

* * * * * *

"Q. How far was the righthand side of your car from the south curb line of Washington Avenue * * *

right before you were going to make your right turn? A. * * * I would say the front of my car was about in the neighborhood of eight feet from the curb. The front of my car was at a 33-degree angle making my turn."

Defendant May further testified that as he proceeded down Washington Avenue the right side of his car was about four feet from the south curb. The following also appears from his testimony:

"Q. When you started into the turn, where was the bus? A. I don't know. I was watching the pedestrians on the curb. There were people standing there waiting to walk across Washington and to walk across Eighth.

* * * * * *

"Q. How fast were you going as you started your turn? A. I would say in the neighborhood of not over five or six miles per hour."

Michael Barylski, appellant's bus driver, testified for the appellant. He stated that after taking on passengers at the bus stop on the north side of Washington Avenue he proceeded forward into Washington Avenue. He further stated that as he passed the north curb line and entered the intersection he looked toward the west and saw a car coming. It was 180 to 200 feet away traveling in the eastbound streetcar tracks, one wheel in each rail. He did not note the speed of this car. His bus was then traveling at the rate of about one mile an hour. After seeing this car he directed his attention south into the intersection and proceeded across without again looking to the west. He accelerated his speed, but at no time drove more than five miles per hour. He was within ten feet of clearing Washington Avenue when the impact occurred. He stopped the bus in two feet. The impact occurred at the front right wheel, as the wheel was crossing the south rail of the streetcar tracks. The front wheel is located about seven feet from the front end of the bus. The reason he did not look to the west as he crossed the intersection was: "I was more concerned with the pedestrians." He stated that his view

to the west was clear, and that there was nothing to prevent him from looking in that direction. He did not swerve the bus in any direction, or sound a warning. The pedestrians who gave him concern were those standing on the south curb who might cross in front of him.

Appellant's contention cannot be sustained. It may be that the jury believed the whole of May's testimony. On the other hand, they may have found for defendant May upon consideration of the plaintiff's testimony and that of the bus driver. The latter testified that he drove the bus from the north curb to the point of collision without once looking to the west for on-coming traffic. We have no way of determining on what evidence the jury reached its conclusion exonerating defendant May. Nor need we do so. Plaintiff's evidence made a case for the jury under the res ipsa loquitur doctrine, and she was entitled to a submission under that theory. In making her case she was not compelled to rely on the testimony of defendant May, which was contradictory of her own testimony.

Appellant assigns as error the giving of plaintiff's Instruction No. 7. Said instruction is as follows:

"The Court instructs the jury that if you find and believe from the greater weight of the credible evidence the facts to be as submitted in instruction No. 1, then the plaintiff has met and carried the burden of proof required of her under the law and under the other instructions herein as to the defendant, St. Louis Public Service Company.

"You are further instructed that such negligence as to said defendant need not be proven by direct and specific testimony, but such negligence may be inferred by the jury from the facts and circumstances in evidence."

By Instruction No. 1 the court charged the jury that if they found that the motorbus was "being operated in a general southerly direction on Eighth Street * * *

and * * * the defendant, Leonard May, was operating the automobile * * * in a generally easterly direction on Washington Avenue * * * and that said motorbus and said automobile came into collision whereby plaintiff was directly caused to sustain injuries * * * then you are instructed that such facts (if you believe them to be true) are sufficient circumstantial evidence to warrant a finding by you that the defendant, St. Louis Public Service Company, was negligent, and you may so find unless you find and believe from all the other facts and circumstances in evidence that plaintiff's said injuries, if any, were not due to the said St. Louis Public Service Company's negligence, and if you so find and believe from all the evidence in the case that the St. Louis Public Service Company was negligent and that plaintiff's injuries, if any, were directly caused in whole or in part by the said defendant's negligence, then your verdict should be for the plaintiff, Marie Long, and against the defendant, St. Louis Public Service Company, a corporation."

Appellant contends that since the facts referred to in Instruction No. 7, even if true, are not sufficient to compel a verdict for plaintiff, it was error to tell the jury that if they did find said facts to be true the plaintiff had met and carried her burden of proof. The Supreme Court has overruled such contention in several cases where similar instructions were involved. Venditti v. St. Louis Public Service Co., 362 Mo. 339, 240 S.W.2d 921; Williams v. St. Louis Public Service Co., 363 Mo. 625, 253 S.W.2d 97; and Davis v. Kansas City Public Service Co., 361 Mo. 61, 233 S.W.2d 679. We are bound to follow those decisions. Any re-examination of the law with respect to this matter is for the Supreme Court.

It is next urged that Instruction No. 7 is erroneous for the reason that in the second paragraph thereof a finding of negligence from the facts and circumstances in evidence is permitted without limiting such finding to the facts and circumstances which furnish the basis for a res ipsa submission. We do not believe that the language in question, when considered in connection with Instruction No. 1, is subject to the criticism made against it. Harrison v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 348.

The last two assignments of error are: (1) that the testimony of Dr. Wennerman, plaintiff's witness, did not constitute substantial evidence and should have been stricken from the record; and (2) that the verdict is grossly excessive. This necessitates a review of the evidence bearing on plaintiff's injuries.

Plaintiff testified that on the occasion in question she was thrown forward from where she was standing against the coin box, and then down into the stairwell of the bus. After the accident plaintiff walked to Olive Street and then went home on a bus. While on the bus she suffered pain in her back and neck. She also became nauseated. When she arrived home her daughter tried to get in touch with a doctor but was unable to do so. At that time there were bruised spots on her leg, instep, and on the lower part of her back. The next morning plaintiff consulted Dr. Stone at the DePaul Hospital. Dr. Stone examined plaintiff and prescribed as treatment that she should lie flat on her back and place rolled towels under her back. She followed these directions for about a week. Her daughter, who was a trained nurse, assisted her in following the doctor's orders.

On March 30, 1952, plaintiff consulted Dr. Helbing. Dr. Helbing examined her on that date and recommended that oil be rubbed on plaintiff's back, to be followed by hot showers. She followed this direction. She visited Dr. Helbing's office about five times, then, around June 1st, consulted Dr. Hirst, an osteopathic physician and surgeon. She testified that at that time her neck and back hurt and that she suffered from terrific headaches and nausea. She stated that from March 24th until she went to Dr. Hirst she would become nauseated every time she ate. She advised Dr. Hirst of her complaints. She was treated by Dr. Hirst approximately twenty times.

Those treatments consisted of heat for the back, and adjustments to the neck. She continued under the care of Dr. Hirst until October, 1952, during which time the heat treatments and neck adjustments were continued. By October there was some improvement, although the pain in the back and neck, and the headaches, had not completely stopped. Her nausea at that time "was not too bad." She stated: "I still had it." At the time of trial, plaintiff stated that she still had pain in her neck and back. The pain in the neck was in the lower part of the neck, and the pain in the back was at about the waistline, mostly on the left side. She stated that she had not gone for any extended period of time without pain in the back and neck, and "sometimes it was worse than others."

Plaintiff lost about ten pounds during the summer of 1952, and has been unable to regain this loss. At the time of trial she weighed about 115 pounds. She stated that her health prior to the accident was excellent. Plaintiff was off work for one week following the accident, and lost no time from work afterwards as a result of her injuries. There was no submission of lost wages, or reduction in future earning capacity.

The plaintiff was injured in a second accident in November, 1953. She was treated by Dr. Hirst for the injuries received in this accident.

Dr. Hirst testified that he first saw plaintiff on June 4, 1952, at which time she complained of headaches, pain in her neck and lower back. The doctor testified that his examination of plaintiff revealed limitation of motion in her neck and back, and stiffness in both regions. He also testified that there was tenderness in the neck and that movement of the neck from side to side would cause muscle spasms. He further testified that he saw and treated the plaintiff on twenty-two different occasions from June 4, 1952, to the following October, and that his treatments consisted of medicine and osteopathic manipulative treatments. He stated, in answer to a hypothetical question, that the condition he found was due to accident. This opinion was based on his findings of limitation of motion and muscle spasms in the areas involved, as well as the subjective complaints of the patient.

On cross-examination, Dr. Hirst testified that plaintiff had improved by October, 1952, when he released her from further treatment, although she still had some complaints. The stiffness in plaintiff's neck was reduced, and she could move her head around. He did not recall that she complained of nausea at that time.

On February 27, 1953, Doctors Sante and Weir, at appellant's request, made an examination of plaintiff. X-rays were taken of plaintiff's neck and back at the time. These X-rays were produced in court at the trial of this case, and were interpreted by plaintiff's witness, Dr. Wennerman, and from them the doctor gave certain opinions with respect to plaintiff's injuries.

Dr. Wennerman testified that he first saw plaintiff on May 22, 1954, and had treated her from that date until the time of trial. He saw her about thirty times. At this point, appellant's counsel interposed an objection stating that he did not believe the testimony relevant, unless confined to the first accident. Counsel for plaintiff, in effect, stated that the testimony would be so limited. He further stated that Dr. Wennerman—

"examined Dr. Sante's and Dr. Weir's X-rays taken in February, 1953, and the second accident happened over seven months later, and that his conclusions from Dr. Sante's and Dr. Weir's X-rays conform with his. There will be this, your Honor, that will be questionable, he will not be able to state as a matter of fact whether the nervousness arose out of the first or second accident, because he didn't see her then, nor does he have any evidence that he can reasonably state medically which accident produced it, so I do not intend on purpose to bring that out. * * *

"The Court: In view of counsel's statement, the objection will be overruled, subject, of course, to the right to move to strike in the event the testimony is not connected with what counsel says."

Dr. Wennerman then testified that he had examined the X-ray plates taken by Dr. Sante and Dr. Weir, which were plaintiff's Exhibits 1 to 9, inclusive. The transcript then shows the following:

"Q. Now, Doctor, keeping in mind that we want your examinations, your findings, your prognosis, and all that, confined to what in your opinion is attributed to the first accident, would you tell us what course your examination and treatment took of Mrs. Long, what treatment you gave her, what your findings were, and what is the prognosis in your opinion? A. Well, the treatment I gave her was particularly shortwave diathermy applied to her neck and lower part of her back. The prognosis is guarded because, although considerable time has elapsed, she has not improved very much, if any. As to the findings, or, rather the diagnosis, I feel that she had an injury to the cervical spine—that is, the neck. * * * I base that upon the X-ray findings. She has, as the X-ray shows, a narrowing of the interspace between the bodies of the fifth and sixth cervical vertebrae—that is in the neck— and that was present following this original, or first, injury. I know this to be so because I have seen X-rays made after that first injury and have seen a copy of Dr. Sante's findings after that first injury."

Dr. Wennerman stated that the X-ray marked plaintiff's Exhibit 3 showed that "the space between the body of the fifth and the body of the sixth vertebrae is considerably narrowed over the similar interspaces, both above and below that level." He further testified that plaintiff's Exhibit 8, which was a view of the lumbar spine, showed "a little, as we term it, spik-

ing, or overgrowth of bone tissue, which is characteristic of hypertrophic arthritis— mild in this case." The doctor stated that he based his conclusion from the X-ray findings made subsequent to the accident that this strain on the cervical spine arose from the accident. He stated that the narrowing between the fifth and sixth cervical vertebrae and the hypertrophic changes in the lumbar area appeared about the same on X-rays which he himself took after May 22, 1954. In addition to strain of the cervical spine, the doctor made a diagnosis of arthritis of the lumbar spine. He did not believe that this arthritis was directly caused by the accident, but thought that in all likelihood it was aggravated by the accident. He also stated that the narrowing of the interspace between the 5th and 6th cervical vertebrae indicated a narrowing of the disc between those vertebrae. He also gave as his diagnosis a strain of the lumbar spine, possible ruptured intervertebral disc, and arthritis of the left sacroiliac joint. This latter was also shown by X-rays which he himself made, and by plaintiff's Exhibit 9, and X-ray taken by Dr. Sante. The doctor further stated that in his opinion plaintiff would continue to have trouble as a result of the conditions which he found. Asked upon what he based this opinion, the doctor replied:

"Upon the X-ray findings of arthritis in her lumbar spine and sacroiliac, on the narrowing of the interspace between the vertebrae in her neck, and because the condition has persisted so long. * * * The narrowing will not improve. The symptoms from it may subside for a while, but will recur unless some form of treatment is undertaken to try to correct this condition. * * * Arthritis of this sort gradually gets worse. It doesn't get better. As the patient ages and the aging process continues, the condition usually gets worse. * * * Her symptoms may improve somewhat, depending upon factors. The season of the year is a factor. The climate is a factor. The amount of

stress she puts on her back is a factor. But the actual changes that are present are not going to improve.

"Q. Will the narrowing between the fifth and sixth cervical vertebrae ever improve. A. No."

On cross-examination the doctor stated that it was not his contention that trauma caused the arthritis. Plaintiff had this arthritis prior to the accident, and there was a very slight amount of it shown in the lumbar area. It could be aggravated by trauma and, on the other hand, arthritis could cause pain without trauma. He first saw plaintiff after the second accident, and his notes show that plaintiff had about recovered symptomatically from the effects of the first accident when the second accident happened. She had not recovered so far as the changes shown in the X-rays were concerned. Plaintiff told the doctor that at the time of the second accident she had improved. The witness further stated that he could not tell from the X-rays alone whether the arthritic condition had been aggravated, and to make such diagnosis he would have to rely on what plaintiff told him. He stated that although the condition of narrowing of the interspace between the 5th and 6th cervical vertebrae was shown on Dr. Sante's X-rays taken February, 1953, it was possible for it to have been present for years prior to that date, but that in the absence of any previous injury he thought it safe to assume that the injury of March 24, 1952, brought it about. He stated that the narrowing in the disc indicates that the center of the disc, which is a gelatinous disc, has been extruded, and that presses on the nerve structures. Near the close of the cross-examination, the following appears:

"Q. Didn't you have to take into consideration the second accident? What troubles me is how you can attribute things to an accident that happened two years before, when you know in your own mind—at least according to the lady, she was thrown down on one knee, according to the report you have there, the second time?

A. Well, I base that on what I said earlier, and that is that pictures made before the second accident revealed the findings I have described.

"Q. Is there any difference in the films made before the second accident and the pictures you made? A. No, not that I know of.

"Q. The narrowing of the space the same? A. Yes.

"Q. And the amount of arthritis is the same? A. Approximately.

\* \* \* \* \* \*

"Q. As a matter of fact, when you saw her most of the symptoms she had were the result of the second accident, weren't they? A. The symptoms were many of them the result of the second accident. The signs were the result of the first accident—in my opinion.

\* \* \* \* \* \*

"Mr. Bardgett. At this time, your Honor, I would like to ask that all the testimony of Dr. Wennerman be stricken from the record, on the ground that at no time during the entire testimony were the injuries, or the condition of the plaintiff, or any of them, connected up to the accident in question.

"The Court. That will be denied."

Appellant contends that the opinion testimony of Dr. Wennerman was not supported by sufficient facts and circumstances as to give it probative value. In support of this contention it is argued that since the X-rays did not show when the narrowing of the intervertebral space between the 5th and 6th cervical vertebrae occurred, no opinion as to its cause could be based upon the X-ray findings alone. This contention rests upon the premise that the doctor, in forming his opinion, considered only the condition shown by the X-rays. We do not believe that is true when the whole of his testimony is considered. The doctor had before him the facts with

reference to the accident, plaintiff's complaints, and the fact that there was no history of any previous trauma to the area involved. These facts, taken in connection with the X-ray findings, were sufficient to afford a basis for an expert opinion as to the cause of the condition. When asked how he arrived at the conclusion that the strain which produced this condition arose out of the occurrence of March 24, 1952, the doctor replied: "Because the X-ray findings followed, apparently, that accident, and were present before the second accident." When asked if the condition could have been present for years prior to the date the X-rays were taken, he replied: "Well, it is possible, but in the absence of any previous injury, I think it safe to assume that the injury brought it about." It thus appears that the doctor's testimony was not based solely on the X-ray findings. In our judgment, his opinion testimony connecting up the neck injury with the accident was substantial evidence.

Dr. Wennerman was permitted to testify that, in his opinion, plaintiff would suffer future pain from the arthritic condition in her spine. Appellant contends that this evidence should have been stricken from the record for the reason that there was no evidence that the arthritic condition shown by the X-rays had been aggravated by the accident. In this respect, appellant is in error. Dr. Wennerman testified that in all likelihood the arthritis had been aggravated by the accident.

Appellant's final assignment is that the verdict is excessive. In passing upon this assignment we must keep in mind certain well settled rules. In the first place, the court must view the evidence in its most favorable aspect to plaintiff's case, and all evidence which tends to support the verdict must be taken as true. Mickel v. Thompson, 348 Mo. 991, 156 S.W.2d 721; Peterson v. Kansas City, 324 Mo. 454, 23 S.W.2d 1045; Webb v. Missouri-Kansas-Texas R. Co., 342 Mo. 394, 116 S.W.2d 27; Biener v. St. Louis Public Service Co., Mo.App., 160 S.W.2d 780. It is also a fundamental rule that the appellate court should not disturb a verdict as excessive unless it appears that it is so grossly excessive as to indicate an arbitrary exercise and abuse of discretion. Mickel v. Thompson, supra; Sutton v. City of St. Joseph, Mo.App., 265 S.W.2d 760. With these rules in mind, we have carefully examined the evidence presented by the record and have concluded that the case is not one which calls for the interference of this court on the ground of excessiveness.

Finding no error in the record, the judgment is affirmed.

MATTHES, J., and SAM C. BLAIR, Special Judge, concur.