CLAYTON SOWERS v. I. E. HOWARD, Defendant, and STANDARD OIL COMPANY, INDIANA, Appellant.—139 S. W. (2d) 897.

Division Two; May 4, 1940.

*Brewster, Brewster & Brewster, William B. Bostian* and *R. R. Brewster* for appellant.

*James Collett, Harry K. West, Trusty, Pugh & Trust* and *Guy Green, Jr.,* for respondent.

BOHLING, C.—The opinion in this case, pending on rehearing, was written by Commissioner COOLEY on original submission. After a careful consideration of the issues we reach the conclusion his disposition of the case was correct and we adopt his opinion, making such additions and modifications as appear proper in the light of the presentation on rehearing.

"Respondent Sowers, plaintiff below, sued I. E. Howard and the Standard Oil Company (of Indiana) a corporation, for damages for personal injuries received by him in a collision between his automobile and a truck driven by Howard. It is claimed that Howard, at the time, was agent of his co-defendant and was acting within the scope of his authority. Plaintiff obtained judgment for $9000 against both defendants, from which defendant Standard Oil Company alone appealed. For brevity we shall refer to said appealing defendant as the company or as appellant.

"The collision occurred at about 8:30 P. M. on Sunday, June 3rd, 1934, near the top of King's Hill, on Highway 24, some three and a half miles east of Brunswick, Missouri. Highway 24 runs generally east and west and for the purposes of this case we may so designate directions. There is, however, a curve at or near the top of King's Hill, the curve being to the right as you go westward, and *vice versa,* which we may need to refer to later. Also the road passes through a cut at about the top of the hill and from the top of the hill slopes downward, rather steeply we gather from the record, toward the west. Plaintiff, accompanied by his wife, was driving eastward in his automobile, approaching the top of King's Hill and Howard,

accompanied by his wife and his father, was driving westward in a truck (to be more definitely referred to hereinafter). The two vehicles collided ('side swiped') as they were respectively rounding the curve or just after the truck had rounded the curve, resulting in plaintiff's injuries. There was evidence tending to show that Howard was guilty of negligence, also evidence tending to show that he was not. That evidence need not be detailed since, if a submissible case was made as to appellant, the question of fact thus presented was for the jury.

"Appellant was engaged in the sale and distribution of gasoline and petroleum products and maintained a station, called a B. Station, at Brunswick, Missouri. By written contract it had, prior to the accident here involved, employed Howard as its agent to manage that station and to sell, on a commission basis, its products within a defined territory. For clarity we state here that it seems to be conceded—at least is sufficiently shown—that the place of the accident was within the geographical limits of Howard's assigned territory and that within such territory he was authorized to sell and deliver, from truck, the appellant's products.

"Said contract provides, in substance:—

"Howard is employed as the company's agent to operate its bulk station (B. Station) at Brunswick, Missouri, 'and in connection therewith to sell its petroleum products . . .' in certain (assigned or to be assigned) territory, on these terms and conditions:

"1. He will devote his time and attention to said employment.

"2. That he has received full instructions as to his duties and will comply therewith and with such other instructions and rules as may be given him from time to time.

"3. That he will operate the station efficiently, etc., (not here important).

"4. That he will sell for cash or on credit at price fixed by the company, remitting for cash sales as instructed, and will extend credit only to such persons as the company may authorize.

"5. That he will not sell or pledge the company's goods for his personal account.

"6 (Refers to sales to unauthorized customers, deductions on account of such sales from any amount due agent on termination of contract, etc. Seems to have no bearing here.)

"7. (Deals with financial responsibility to company for sales made to service stations and uncollected for, has no bearing on this case.)

"Paragraphs 8, 9 and 10 read as follows:

" '8. That he will provide and maintain, at his own expense, whatever truck chassis may be necessary to make proper sale and delivery of the Company's products (the Company to furnish tank, bucket box and buckets) and will personally operate one of said vehicles daily, except Sunday. In the event of his inability to operate one of said vehicles he may, with the consent of the Company, employ, at

his own expense, a driver to operate said vehicle during such time as he is unable to operate the same.

" '9. That he will pay any and all taxes, license fees, excises, mileage fees and privilege taxes that may be levied or imposed upon said truck or trucks and-or upon the operation thereof.

" '10. That he will employ, at his own expense, suitable drivers to operate such other trucks as may be necessary upon the following conditions:

" ' (a) No driver or drivers shall be employed by him except with the consent and approval of the Company.

" ' (b) All drivers shall comply with the rules and regulations of the Company in a manner satisfactory to it.

" ' (c) Drivers not satisfactory to the Company shall be discharged by the agent upon the Company's request.

" ' (d) That he will be responsible to the Company for the acts of his said employees, including proper accounting for petroleum products entrusted to them for sale and proceeds derived from sales thereof and unauthorized sales and deliveries made by his driver or drivers, to the same extent and in the same manner as if he had made such sales and deliveries personally.' .

"Paragraph 11 provides that the agent's compensation shall be in accordance with an attached 'rider,' which rider provides that the company will pay the agent a salary of $44.00 per month and in addition certain designated commissions on sales made, said salary being based on the operation of one truck and 'if in any month the number of trucks required (see paragraph 10) increases or decreases, said salary shall increase or decrease proportionately.'

"Subsequent paragraphs of the contract deal with the time and manner of payment *of commissions* and also provide that the company may, in writing, change or modify salary or commissions. Changes were subsequently made by other 'riders' attached, affecting the amount of commissions on sales made, but not affecting the matter of salary or the scope and purport of the contract as applied to the question of agency. We think it would needlessly lengthen this opinion to set out in detail these provisions, which are quite long.

"Plaintiff introduced evidence tending to show that the 'truck' which collided with his car consisted of engine, cab and chassis, with, mounted on the chassis, a gasoline tank such as is generally used for transportation of gasoline by truck and appurtenant thereto certain 'barrel racks' or 'bucket racks' along side the tank, and that" the words "Standard Oil Company" or the word "Standard" appeared on the racks and, on the tank, "License No. 18—1934" and (possibly) on the rear "Red Crown Gasoline," and on the cab doors was a circular decalcomania displaying the words "Standard Oil Company" in an outer band and the insignia "S. C. Co." within.

"Defendant Howard, at the time of the accident, was returning from Macomb, Illinois, with his father, for whom, by prearrangement between the two, he had gone to get the latter to work for him as helper to drive an extra truck in the Brunswick territory. Howard and his wife left Brunswick for Macomb about 10:00 P. M., Saturday, June 2nd, and were returning, with Howard's father, when the accident happened the evening of Sunday, June 3rd. Macomb, Illinois, is approximately 220 or 235 miles from Brunswick, Missouri, and many miles outside Howard's assigned territory. On that trip Howard drove the truck above mentioned, without removing the gasoline tank and its appurtenances. There was evidence from which we think the jury could legitimately find that he did so with the consent of his superior, the company's representative. There was evidence tending to show that said representative did consent (though rather reluctantly) because Howard had and could obtain no other means of transportation. Nothing was said about whether or not the tank should be taken off before making the trip.

"In this situation it becomes important to note the purposes of that trip. We have epitomized the contract between the company and Howard. Howard did not appear at the trial as a witness but his deposition had been taken twice, both times *by plaintiff*. The first deposition was introduced in evidence by defendants as part of their case in chief. In that deposition Howard testified in substance and effect that in making the trip to Macomb for his father he was not doing so in behalf of the company, was not acting for the company, that he did not have with him any products belonging to the company and did not, either going or returning, make any sales or deliveries of company products; that he had had no permission from the company to use the truck for the purpose of going for his father, that he had had no conversation with anyone connected with the company about using the truck for that trip, that the truck, that is the engine, cab and chassis belonged to him and the company simply loaned him the tank with its appurtenant equipment, that he had completed his work for the company on Saturday evening before he left for Macomb and had no business to do and did no business for the company before he got back home to Brunswick the following Sunday night. In short, his testimony in that first deposition was in substance and effect that at the time of the accident he was not engaged upon his employer's business.

"At the time that first deposition was taken Howard was still working for the company. Thereafter he ceased to work for it. After he ceased to work for the company his deposition was again taken by plaintiff and in that second deposition he changed, in material respects, the testimony given in his first deposition.

"As we have said, plaintiff, though having taken it, did not introduce the first deposition. Defendants did. *Plaintiff*, in rebuttal,

introduced the *second* deposition. And it is interesting—perhaps significant—to note plaintiff's reasons advanced and upon which, of course, the court ruled . . . ." Plaintiff's reasons are quoted infra.

"In this second deposition Howard testified, in substance, that:—

"On his first deposition he was fully examined on all phases of the case—(he did not explain *why* he was changing his testimony given in his first deposition); that he worked in the 'Quincy District' which was divided into approximately 104 subdistricts or stations, of which that at Brunswick was one; he described his territory, which we understand included the place where the accident occurred; said his immediate superior was a Mr. Wagner, who was 'salesman supervisor of B. Stations;' that a Mr. Hathaway was in charge of the district office at Quincy; that prior to the trip to Macomb there was a meeting at Moberly, Missouri, attended by him and other company employees, which meeting Hathaway addressed; that Wagner was present at that meeting; that Hathaway there said that Wagner had full power to hire and fire any agent in his territory; that Hathaway said he (Howard) would take orders from Wagner; that prior to the trip 'to Quincy'—we think from the whole record he meant to Macomb—he talked to Wagner about it and asked Wagner 'if I would be permitted to drive the truck . . . to go after my father so that he might work for me in Brunswick'; that Wagner said it 'Would be better to use some other method to get him over there' but that 'since I had no other means of transportation he stated so far as he was concerned it would be all right. He suggested that I take the matter up with the office'—the Quincy office. Asked if he took the matter up with the Quincy office he said he did. Asked then if he got the permission of the Quincy office he said he did, but that statement was stricken out as a conclusion (witness did not state with whom he talked or what was said) and is not in the case. He further testified (in the second deposition) that the truck body,—engine, cab and chassis—belonged to him and the gasoline tank with its appurtenances (barrel or bucket racks) belonged to the company; that on his return trip from Macomb he had (presumably in that tank) some 100 or so gallons of gasoline and had some motor oil and package grease (small quantities) belonging to the company; that on the outbound trip from Brunswick to Macomb, on Saturday night, he delivered five gallons of motor oil to one Friesz at a point which we understand was within his territory. We find nothing in his testimony as to when that sale was made or as to when the oil was to be delivered.

"In his first deposition Howard said he did not work for the company on Sundays or at night. In the second deposition he said he did sometimes do work on Sundays, though seldom. (The delivery to Friesz is not claimed to have been made on Sunday, on the return trip, but on Saturday night, on the outbound trip.)

"Howard further testified in said second deposition that when he talked with Wagner about using the truck to go for his father nothing was said about whether or not the tank and its equipment should be taken off the truck before making the trip—that question simply not being mentioned.

"Asked to explain his reasons for making the trip to Macomb he testified:

" 'Almost a month prior, a little over a month prior, on the first of May, I had put on a second truck in Brunswick, I had hired a man with the permission of the Standard Oil Company and he hadn't proved satisfactory. Always before in the summer months my father had worked for me. Due to the fact this man didn't prove satisfactory I called my father on the telephone and asked him if he would come to Brunswick and run this other truck. He said that he would, and I made arrangements to go after him.'

"Howard further testified that before arranging with his father to work for him he had consulted Wagner and a Mr. Middleton, (company 'sales promoter'), and they said it would be all right for him to employ his father. He further testified that in all his dealings with the company he was governed by the written contract (above epitomized) and derived therefrom his authority to act for the company. There was no evidence tending to show, and there seems to be no contention, that Howard made or contemplated making any sales or deliveries or transacting any other business for the company on the return trip from Macomb. His testimony in both depositions negatives such thought. It might be added that his wife's testimony (by deposition) was that he made no sales or deliveries and transacted no business for the company either on the way from Brunswick to Macomb or on the return trip. That deposition, also, was taken by plaintiff, but plaintiff did not offer it in evidence. It was introduced by defendants. Perhaps, therefore, we should disregard it in determining the question of submissibility as to appellant. If necessary, other facts will be stated in the course of the opinion.

"We take first the question whether there was a submissible case made against appellant on the theory that at the time of the accident Howard was appellant's agent, acting as such and within the scope of his authority—or in other words sufficient evidence to invoke the doctrine of *respondeat superior* as against appellant . . ." We think the question "is determinable by the facts shown by positive testimony—not alone that offered by defendants and the question whether or not it rebuts a *presumptive* (?) prima facie case made by plaintiff, but by the plaintiff's evidence.

"For the purposes of a demurrer to the evidence it is well settled that the plaintiff's evidence is to be taken as true (with such favorable inferences as may reasonably be drawn therefrom) and the defendant's countervailing evidence will be disregarded. An in-

teresting and somewhat novel question arises, viz.: Since plaintiff took both of Howard's depositions and himself introduced the second" deposition for the stated purposes: "We now, in rebuttal, and on the issue of what Howard was doing, and his permission to do it, and arrangements he made and what he had with him on the issue of scope of employment, whether or not he and the truck were performing services for the Standard Oil Company, whether or not what he was doing was incident to his employment, we now offer in evidence the deposition of I. E. Howard, taken on March 8th, 1935 . . ."; "did not plaintiff thus vouch for Howard's truthfulness and make him at least as much his own witness as he had become defendant's witness by the introduction by defendant of the first deposition—taken as it was by plaintiff? As we have said the question is novel and interesting, but we do not deem it necessary to decide it. We are convinced that at least Howard's second deposition, in the circumstances shown, taken and introduced in evidence by plaintiff, must be treated as plaintiff's evidence." Plaintiff's attack, on rehearing, on this conclusion is not well taken. The issue is not restricted to parts of a single deposition offered by each litigant. At the trial plaintiff's counsel, as indicated, offered the second deposition as substantive evidence of the facts therein testified to, not merely in rebuttal or for impeachment. The objections interposed by appellant's counsel were not sustained and were not binding on plaintiff. A reading of the deposition discloses plaintiff took the second deposition for the purpose of adducing substantive testimony on the issue of *respondeat superior* rather than for the impeachment of Howard with respect to his first deposition. On rehearing, as on original submission, plaintiff refers to certain facts not elsewhere developed in support of the contention a submissible case was made. This attack appears to be refuted by plaintiff's position here as well as *nisi*. We adhere to our conclusion on original submission. "Taking that deposition with the other evidence offered by plaintiff (and disregarding the first deposition) we have these facts:—Howard worked under a written contract, which authorized him to employ a helper of his own selection and at his own expense—with the company's consent and approval, it is true—the helper to be employed and paid by him, and he to be responsible to the company for sales made by the helper. He had arranged with his father to employ the latter as such helper, 'to work for him,' as he testified, and made the trip to Macomb for the purpose of bringing his father to Brunswick to enter upon such service. They had not reached Brunswick and the father had not actually begun service under the employment at the time of the accident. Howard was driving a truck, owned by him but which had upon it a gasoline tank belonging to the company. The whole outfit was used by Howard in transacting the company's business, as was evidently contemplated

by-the contract, but we think it also evident that the contract did not contemplate and the parties did not understand that Howard should use it, especially the part thereof belonging to the company, for his personal use or pleasure so as to make the company responsible, as his employer, for his acts or negligence while so using it. In Howard's second deposition he explained why he made the trip to Macomb, viz., to get his father and bring him to Brunswick to work for *him* (defendant Howard). There was no hint in his testimony that he had any other purpose in making that trip.

■ "Now, leaving out of consideration for the moment the alleged delivery of the five gallons of oil to Friesz, was this trip to Macomb on business of the company or, in legal contemplation, within the scope of Howard's agency so as to make appellant liable on the doctrine of *respondeat superior?* We think not.

"In Byrnes v. Poplar Bluff Printing Co. (Mo. Div. 1), 74 S. W. (2d) 20, 23, we read:

" 'If it be shown that at the time the negligent act in question was committed, the servant, though using the instrumentalities of the master, with or without the master's consent, is doing so for his own purpose and in pursuit of his own business or pleasure, the master is not liable. As applied to the use of an automobile, this rule is perhaps nowhere better stated than in Daily v. Maxwell, 152 Mo. App. 415, 426, 133 S. W. 351, 354, thus: "All the authorities are in accord in holding that, in an action based on the negligent running of an automobile, the owner of the car who was not present at the infliction of the injury cannot be held liable, except it be shown that the person in charge, not only was the agent or servant of the owner, but also was engaged at the time in the business of his service. [Cases cited.] Where a chauffeur, either with or without his master's consent, uses the machine for his own business or for his own pleasure, and negligently inflicts injury on another, the master cannot be held liable, for the reason that the negligent act, being entirely outside the scope of the servant's employment, cannot call into action the rule of *respondeat superior.* The fact of consent is material only in the solution of the issue of whether or not the use of the machine was, in fact, on business of the master." ' "

The Byrnes case involved an automobile a corporation furnished its president for transportation to and from work. The corporation was held for an accident occurring while the car was being so used on the theory such use enabled the president to devote more time to the corporation's business or that the furnishing of this means of transportation was advantageous to the corporation and it was understood and implied in the contract of employment the corporation would furnish this transportation as one of the terms of the president's employment. If so, such use was within the scope of the employment. Observations are there made *arguendo* to the effect "that if *with the*

20

*master's consent* the servant combines business of his own with that of the master the master may yet be liable. We shall speak of this later. For the present, of the proposition first stated.'' Howard was to employ a suitable driver to operate another truck if necessary. The direct evidence on the issue is that another truck was not necessary. ''Such helper, when and if employed, was his employee to be remunerated by him in such manner as they might agree upon. The proposed helper had not yet entered upon the intended service. (Whether or not the company might have become liable for negligent acts of the helper after he had, with its consent, begun service, we think it unnecessary to decide.) In this situation and so far as concerns merely the use of the truck by Howard in going after his father, even though with knowledge and consent of appellant, we do not think appellant would be liable.''

■ With respect to a case made, the presumption arising from mere proof of ownership in defendant of the automobile involved disappears upon substantial proof that the automobile was being operated by another; and the presumption arising from mere proof that such other was in the general employ of defendant disappears upon substantial proof that such other was acting outside the scope of any employment by defendant. [State ex rel. Kurz v. Bland, 333 Mo. 941, 944[2, 3], 64 S. W. (2d) 638, 639[2], reviewing cases; State ex rel. Waters v. Hostetter, 344 Mo. 443, 126 S. W. (2d) 1164, 1166[3]; State ex rel. Steinbruegge v. Hostetter (Banc), 342 Mo. 341, 115 S. W. (2d) 802; Ross v. St. Louis Dairy Co., 339 Mo. 982, 989[1], 98 S. W. (2d) 717, 720[1]. Annotations, 42 A. L. R. 898, 74 A. L. R. 951; 96 A. L. R. 634; and, generally, Annotations, 122 A. L. R. 858; 80 A. L. R. 725; 68 A. L. R. 1051; 45 A. L. R. 477; 22 A. L. R. 1393.] Presumptions of this nature, involving the burden of the evidence, call for a consideration of all the evidence bearing on the ultimate fact The direct evidence in the instant case is that Howard owned the truck and alone was concerned with its maintenance and repair. Mann v. Stewart Sand Co., 211 Mo. App. 256, 243 S. W. 406, involved a commercial truck. Defendant stood upon a demurrer to plaintiff's evidence. It is not authority for a holding that such presumptions, when a commercial vehicle is involved, are not put to flight by substantial evidence contra.

Other cases stressed by plaintiff are to be distinguished. In Cotton v. Ship-By-Truck Co. and Hartz, 337 Mo. 270, 277, 85 S. W. (2d) 80, 84[8, 9], Hartz, the owner of the truck involved, in consideration of 85% of the freight charges, transported for the company, a common carrier, freight over a certain route out of Kansas City, collected the freight charges not prepaid and accounted therefor to the company upon his return, but was permitted, on his own behalf, to ''circle around'' and receive cream and milk for transportation to Kansas City. The accident happened after Hartz had made deliv-

eries of all freight on the trip. It was held the relationship between Hartz and the company required his return and accounting for freight collected and also that a finding that the company authorized Hartz to combine his own with its business was justified. In the instant case, Howard furnished and maintained the truck, according to the written contract, to make proper sale and delivery of the appellant's products in assigned territory. (This sufficiency distinguishes the instant case from the Byrnes case, supra.) Performance did not require Howard making the trip to Macomb, Illinois, which was made voluntarily by Howard for the convenience of himself and his father. It was not material to appellant how Howard's father reached Brunswick. Appellant did not require Howard to make the trip.

Plaintiff makes the point that Howard could not legally transport appellant's gasoline unless he was transporting it for appellant, citing Sec. 7820, R. S. 1929, Mo. Stat. Ann., p. 5258; Waters v. Hays (Mo. App.), 130 S. W. (2d) 220, and State ex rel. Waters v. Hostetter, 344 Mo. 443, 126 S. W. (2d) 1164, 1166[4]. Section 7764(c), R. S. 1929, Mo. Stat. Ann., p. 5186, was involved in the Waters cases. It permits the display of dealer duplicate number plates on motor vehicles used in the business of a motor vehicle dealer but specifically prohibits such display on vehicles used for private purposes or hired or loaned to others. On the other hand, Sec. 7820, requires distributors and dealers in motor vehicle fuels to secure a license therefor and mark all trucks, etc., used in the transportation of such fuels with the serial number of such license, but does not prohibit, so far as here involved, the use of trucks bearing such license numbers for other purposes. The facts distinguish the cases.

Citing Shotts v. Standard Oil Co., 181 Minn. 386, 387[1], 232 N. W. 712, 713[1], plaintiff contends the painted wording, etc., on the tank and cab doors advertised the Standard Oil Company and plaintiff made a submissible case. The automobile involved in the Shotts case was as much for advertising as for transportation and was being operated by said defendant's local advertising manager. It was a remodeled two-passenger Ford, painted a brilliant vermillion, and had a large replica of said defendant's Iso Vis cylinder oil container back of the seat. As herein pointed out such was not the purpose of the use of Howard's truck, or Howard's employment by appellant, or Howard's trip to Macomb, Illinois. [Consult Wenell v. Shapiro, 194 Minn. 368, 372, 260 N. W. 503, 506; Ashland Coco Cola Btlg. Co. v. Ellison, 252 Ky. 172, 178, 66 S. W. (2d) 52, 54[2]; Reynolds v. Buck, 127 Iowa, 601, 103 N. W. 946; Annotations, 22 A. L. R. 1437, XXI, and 122 A. L. R. 889, XXI.]

"Coming now to the alleged delivery of the five gallons of motor oil to Friesz on the outbound trip, on Saturday night. As we have forecast, appellant had no information of any intention on Howard's part of doing anything of that kind or of doing anything at all save

to go and get his father to work for him—therefore, cannot be said to have consented to Howard's combining his own business or pleasure with appellant's business. [See Byrnes case, supra.]

''If Howard did deliver said motor oil to Friesz on Saturday night it is clear from his testimony that such delivery was 'merely casual and incidental,' in no sense an inducting or contributing factor in the making of the trip to Macomb, and that he cannot, on account thereof, in the circumstances shown, be said to have been engaged, at the time of the accident, in his employer's service and in the course of his employment in the sense that imposes liability upon the employer. [See Mullally v. Langenberg Bros. Grain Co., 339 Mo. 582, 592, 98 S. W. (2d) 645, 649[3]; McMain v. J. J. Connor & Sons Const. Co., 337 Mo. 40, 85 S. W. (2d) 43.] As shown by Howard's second deposition, introduced by plaintiff, (as well as by the first, which we are not now considering) the trip to Macomb in its entirety was for the purpose of getting and bringing his father to Brunswick to work for him. [See Mullally case, supra.]''

The judgment as to defendant Standard Oil Company, appellant, is reversed. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by Bohling, C., is adopted as the opinion of the court. All the judges concur.