226 S.W.2d 394 (1950)
MONTANA
v.
NENERT et al. (two cases).
Nos. 27764, 27763.
St. Louis Court of Appeals, Missouri.
January 17, 1950.
Motion for Rehearing or to Transfer to Denied February 17, 1950.
*395 Evans & Dixon, John F. Evans, Wm. W. Evans, St. Louis, for appellants J. Rush James and Alma James.
*396 Hay & Flanagan, Neal D. Flanagan, St. Louis, for appellant Robert Nenert.
Coburn, Storckman & Croft, Clem F. Storckman, Gragg & Aubuchon, St. Louis, for respondent.
Motion for Rehearing or to Transfer to Supreme Court Denied February 17, 1950.
ANDERSON, Presiding Judge.
This is an action by Eugene J. Montana for damages sustained by him as the result of a collision between an automobile driven by him and a car owned by defendant Norman Smith and being driven at the time by defendant Robert Nenert. Both of the above named defendants were employees of J. Rush James and Alma James, who were also made defendants. The jury returned a verdict in favor of plaintiff and against defendants J. Rush James and Alma H. James, and Robert Nenert, in the sum of $3500, but found in favor of defendant Norman Smith. From the judgment on this verdict defendants J. Rush James, Alma H. James, and Robert Nenert have appealed.
The case is here on two separate appeals. One appeal, taken jointly by J. Rush James and Alma H. James, is identified in this court as No. 27764. The other appeal, taken by defendant Nenert, is identified in this court as No. 27763. However, regardless of the separate notices of appeal received by the Clerk of this court, and the filing of same under separate docket numbers, there is still but one case in this court, as in the court below. Rothweiler v. St. Louis Public Service Co. et al., Mo.App., 224 S.W.2d 569; Matthews v. Mound City Cab Co., Mo.App., 205 S.W.2d 243; Waterman v. Waterman, Mo.App., 210 S.W.2d 723; Lincoln Trust Co. v. Mersman, Mo.App., 187 S.W.2d 50.
On October 10, 1947, defendants J. Rush James and Alma H. James were operating a partnership business under the firm name of "South Side Chevrolet Company of St. Louis." The main office of the company was located on South Grand Avenue in the City of St. Louis. Shortly before the events which gave rise to this action the company decided to expand and open a branch office with a paint and body shop at Jefferson Barracksa distance of about ten miles from the main office. The new shop building had formerly been used by the United States Army, and at the time of the accident was being cleaned and renovated for use by the company.
Defendants Norman Smith and Robert Nenert were both in the employ of the South Side Chevrolet Company on October 10, 1947. Nenert was regularly employed as an apprentice mechanic, but shortly before the day of the accident, October 10, 1947, he had been ordered, under the direction of Norman Smith, to help clean and renovate the new paint and body shop at Jefferson Barracks. This work was being performed by employees of the South Side Chevrolet Company and involved common labor.
Norman Smith was regularly employed by the South Side Chevrolet Company as the "Body Shop Manager" at the main office on South Grand Avenue. A short time before October 10, 1947, he had been assigned the task of managing and directing the work of setting up the new shop and getting it into operation. William James was the General Manager of the company and was Norman Smith's immediate superior. William James, speaking of the Jefferson Barracks project and defendant Smith's connection with it, testified: "As body shop manager, he was to set it up and get it in operation and manage it."
On the morning of October 10, 1947, Robert Nenert was conveyed from the main office of the company to his place of work at the new shop in a pick-up truck which belonged to the company. This was one of the trucks belonging to the company made available to haul tools and equipment, and to take employees to and from the Jefferson Barracks project. A pick-up truck was also kept at the new shop for these purposes and for hauling debris.
The South Side Chevrolet Company did not furnish either Norman Smith or Robert Nenert an automobile for their personal use. Norman Smith sometimes drove his own automobile to the Jefferson Barracks shop, and sometimes used it to transport people back and forth from said project. He testified that he did not know whether *397 William James, his superior, knew of this use of his (Smith's) car. William James, who was plaintiff's witness, testified that he did not know of such use and that he did not think Mr. Smith ever used his car on any previous occasion for this purpose, and that he was not required to use his own automobile in setting up this new shop; and that the company had no ownership in, and no authority whatever over, Mr. Smith's automobile. When asked whether he ever told Mr. Smith not to use his car, William James replied, "No, I never did. It didn't dawn on me that he would use it."
On the morning of October 10, 1947, a man named Stephens met Norman Smith at the main office of the South Side Chevrolet Company. Stephens was a salesman and desired to solicit an order from the company for a protective fire curtain or screen to be installed at the new shop at Jefferson Barracks. Norman Smith had previously made some measurements relative to this work and Stephens was to make a bid based on these measurements, but on the day in question Smith and Stephens decided it would be best for Stephens himself to check the measurements. They then went to the new shop in Smith's automobile. Stephens left his car parked near the main office of the company on Grand Avenue. Smith, according to the testimony of William James, was not authorized to take salesmen or contractors to the Jefferson Barracks project in his own car. William James also stated that he would not say it was a part of Smith's job to bring salesmen and contractors to the new plant.
After Stephens had completed the task of taking the necessary measurements, Smith directed Robert Nenert to drive Stephens in Smith's automobile back to where Stephens had parked his car. Nenert worked under the supervision of Smith. Smith testified that there was a pick-up truck on the premises furnished by the company which could have been used for this purpose, but he felt that the truck was too dirty to ride in by a well dressed man like Stephens. He also testified that he had no personal reason for getting Stephens back to the South Side Chevrolet Company, but that it was, "only a matter of courtesy I thought. I took him down there and I didn't want him to have to walk two miles to the street car."
Smith further testified that he told Nenert to pick up some equipment, including a sledge hammer, on his return trip to the new shop. He further stated that the reason he chose Robert Nenert to make this trip over the other employees was that he "had a little more confidence in Bob, being there longer in the mechanical department, to drive my own car."
The collision in question occurred at the intersection of Dover Place and Pennsylvania Avenue while Robert Nenert and Stephens were returning to the main office of the South Side Chevrolet Company.
Dover Place runs east and west, and Pennsylvania Avenue runs north and south. Both streets are approximately thirty feet wide. There is a slight incline from south to north on Pennsylvania Avenue as it approaches the intersection in question, and a somewhat greater incline on Dover Place from Broadway, the next street east of Pennsylvania Avenue, to the point where it intersects with Pennsylvania Avenue. The accident occurred at about 11:30 A.M. The day was clear, and the streets were dry. There were no stop signs at any corner of the intersection. Prior to the accident plaintiff was proceeding north on Pennsylvania Avenue at a speed of about twenty-two miles per hour, and defendant Nenert was operating his car west on Dover Place.
Plaintiff testified that when his automobile reached a point about twenty feet south of the intersection he looked to the right, or east, on Dover Place, from which point he could see one hundred feet into Dover Place, but saw no automobile. He further testified that he then proceeded into the intersection and that when the rear wheels of his car reached the center of the intersection he saw the car driven by Nenert about five feet east of him. He stated he was traveling about twenty-two miles per hour at the time, and that immediately upon seeing the approach of the other car he turned to the left and applied the brakes on his car, but was unable to avoid the collision. He stated that the car *398 driven by defendant Nenert came in contact with the right side of his car, and that after the collision his car came to rest approximately five feet west of the west curb of Pennsylvania Avenue, facing in a northeasterly direction, with the rear wheels approximately on a line with the north curb of Dover Place. Plaintiff further testified that as he approached Dover Place the right side of his car was approximately five feet from the east curb of Pennsylvania Avenue. He further stated that he did not sound his horn before the accident, nor did he hear any horn sounded, but did see Nenert attempt to slacken the speed of his car, and heard the brakes of Nenert's car being applied. He stated that Nenert did not swerve in either direction. Plaintiff was unable to estimate the speed of the automobile driven by Nenert.
Robert Nenert testified that he turned onto Dover Place at Broadway, which is just one block east of Pennsylvania Avenue. He further testified that when his car reached a point four feet east of the intersection in question he stopped and looked both north and south along Pennsylvania Avenue, but saw nothing. He stated that at that point he could see to the left, or south, approximately "forty-five feet, about a quarter of a block," into Pennsylvania Avenue. He stated that he then shifted gears and started forward and, after proceeding about nine feet into the intersection, saw plaintiff's automobile coming from the south on Pennsylvania Avenue, about twelve feet south of the center line of Dover Place. He stated that he then put on his brakes and attempted to swerve his car to the right in an effort to avoid the collision. He estimated plaintiff's speed at that time to be approximately thirty-five miles per hour, and that he himself had attained a speed of from ten to twelve miles per hour before he applied his brakes. Nenert further testified that the right front of plaintiff's car came in contact with the left front of his car.
Nenert gave the following testimony in a deposition which was offered by plaintiff as an admission against interest.
"Q. And as I understand it, when you first saw Montana's car you were going between ten and twelve miles an hour? A. Yes, sir.
"Q. Assume all these conditionsthe fact you were going ten to twelve miles an hour, the condition of your brakes at that particular time, the fact you had a passenger in your automobile, in an emergency stop, if one is necessary, in what distance could you stop that automobile with safety to yourself and your passenger? A. Well, I would say about six feet."
Appellants J. Rush James and Alma H. James contend that their motion for a directed verdict should have been sustained for the reason that the evidence adduced is insufficient to establish liability upon them for the negligent acts of Robert Nenert under the doctrine of respondeat superior, and for the further reason that the use by Nenert of the instrumentality which caused plaintiff's injury was neither expressly nor impliedly authorized by them.
We have carefully considered the evidence and have reached the conclusion that these contentions must be sustained. It is clear from the evidence that the main and primary purpose of Robert Nenert's trip was to accommodate the salesman Stephens who was at the time in question furthering his own business in seeking data for the purpose of submitting a bid on a fire curtain which said appellants contemplated installing at the new plant. The South Side Chevrolet Company derived no direct benefit from Smith's act of courtesy toward Stephens. The rule of law applicable is stated in Labatt, Master & Servant, 2d Ed., Vol. 6, Sec. 2289, p. 6913, as follows: "It is manifest that a tort committed by a servant while he was engaged in doing something for the benefit of a third person must in the nature of the case, be regarded as having been committed outside the scope of his employment, except in so far as he may have been acting under the authority of his master."
Smith was, at the time, employed to manage and direct the work of setting up the *399 new shop and getting it into operation. He was neither expressly nor impliedly authorized to transport to and from the shop salesmen interested in selling to the company materials or equipment for use in the work. This appears from the testimony of William James, who was plaintiff's own witness. Having no such authority, Smith could confer none on Robert Nenert. The commands of a foreman which are beyond the scope of his authority cannot be regarded as the commands of the master. Labatt, Master & Servant, 2d Ed., Vol. 6, Sec. 2289, p. 6913; Oganaso v. Mellow et al., 356 Mo. 228, 201 S.W.2d 365; Sowers v. Howard et al., 346 Mo. 10, 139 S.W.2d 897.
The automobile in question was the private property of Smith. The company had no authority over it, and Smith was given no authority, express or implied, to use it in the company's business. Such being the case, no action is maintainable against the master even though the use of the instrumentality was in furtherance of the master's business. The vicarious liability of the master for the tort of his servant should not be extended to include responsibility for injuries sustained through the unauthorized use of such an instrumentality as an automobilebecause of the great risk involved. Liability in such cases should be based only on consent, either express or implied. Labatt, Master & Servant, 2d Ed., Vol. 6, Sec. 2282, p. 6888; McCaughen v. Missouri Pacific R. R. Co., Mo.App., 274 S.W. 97.
In the McCaughen case, supra, it appears that one Liese was a general employee of defendant. His duties consisted of looking out for car thieves and protecting the railroad property. One day, while operating his automobile on a trip to investigate a car robbery, he negligently injured the plaintiff. His use of the car was not authorized by his employer, nor did the latter know of its use. This court held there could be no recovery by plaintiff. The court said:
"In the case at bar, the defendant was not the owner of the automobile. It belonged to the chauffeur, Liese, and therefore the presumption of fact that Liese was at the time within the scope of his service and employment does not arise in this case, and the onus fell upon the plaintiff to affirmatively show that Liese operated the automobile, at the time of the accident, with the knowledge, consent, or authorityexpress or impliedof the defendant.

* * * * * *
"It is not contended, by counsel for plaintiff that there was any express authorization of the said chauffeur to use the automobile in the performance of his duties under his said employment, but it is insisted that he was impliedly authorized to so use it. In the present case there was no evidence adduced that Emmett Liese's contract of employment did embrace the use of an automobile. Neither is there anything in the evidence tending to show that it was within the contemplation of the parties that an automobile was to be used by Liese for the purpose of transacting the defendant's business; nor is there evidence that the use of an automobile was necessary or beneficial to the defendant in the performance of Liese's duties under his said employment. There is also no evidence tending to show that Liese, prior to the accident, was in the habit of going about the defendant's business with the machine. We find nothing in the evidence which would warrant a jury in finding that Liese was impliedly authorized to use the automobile in the service of the defendant at the time the accident occurred.
"Though there was evidence adduced tending to show that Liese was acting in the course of his employment in going to Fourteenth and Market streets for the purpose of interviewing Sergt. Simpkins of the Terminal Railroad Company regarding a car robbery, yet that fact alone is not legally sufficient to go to the jury as tending to show that the use of the automobile by Liese, at the time of the accident, was authorized by the defendant." McCaughen v. Missouri Pacific R. R. Co., Mo.App., 274 S.W. 97, loc. cit. 101.
Nor does the fact that Nenert was instructed by Smith to bring a sledge hammer with him on his return affect the situation. *400 The securing of the sledge hammer was not the inducing factor in the making of the trip, but was casual and incidentalnot sufficient to support a finding that Nenert was about his master's business at the time of the accident. Sowers v. Howard et al., 346 Mo. 10, 139 S.W. 2d 897. But, even if he could be said to be at the time engaged on an errand for the master, no liability could be imposed on the master by reason of the negligent operation of the car, because the use of the car for such purpose was not authorized. McCaughen v. Missouri Pacific R. R. Co., Mo.App., 274 S.W. 97. The trial court erred in failing and refusing to direct a verdict in favor of defendants J. Rush James and Alma H. James.
Since we have ruled that the motion for a directed verdict should have been sustained as to defendants J. Rush James and Alma H. James, it becomes unnecessary to consider the other alleged errors which they have assigned.
Appellant Nenert complains that the court erred in not appointing a guardian ad litem for him prior to the rendition of the verdict. An examination of the additional transcript of the record filed by respondent shows that there is no merit to this contention. Said record shows that on January 19, 1949, before the jury was sworn, the minority of defendant Nenert was suggested by the attorney representing him, and that the court, by its order, appointed Cleo V. Barnhart as guardian ad litem for said minor. This record was, on March 15, 1949, entered nunc pro tunc as of January 19, 1949. Said record also shows that said Cleo V. Barnhart filed his written consent to act as such guardian ad litem. Appellant Nenert further contends that the court erred in entering the order of March 15, 1949, for the reason there never was an order of the court appointing a guardian ad litem which could be made the basis of an order nunc pro tunc. We cannot sustain this contention for the simple reason that the validity of the order in this respect is not before us. There was no appeal from the order of March 15, 1949.
It is also urged that the court erred in permitting plaintiff to offer in evidence the deposition of defendant Robert Nenert, for the reason that said defendant was not represented by a guardian ad litem at the time the deposition was taken. No such objection was made at the time the deposition was offered, hence there can be no such complaint in this court.
Complaint is made of the following argument of plaintiff's counsel: "Mr. Aubuchon: Gentlemen, bear this in mind, if Robert Nenert hadn't been ordered to take Stephens back to the Chevrolet Company this accident would not have happened. Nenert was not on a lark of his own, wasn't any pleasure for him. He was doing what he was told to do. I am telling you now, I am not trying to hurt young Robert Nenert. Bring back this verdict against South Side Chevrolet Company and bring it back against Norman Smith. Bring that verdict back to me, and I will tell you, gentlemen, I will never hurt Robert Nenert."
Appellant Robert Nenert now asks this court to reverse the judgment and remand the cause on account of this argument, contending that it was improper in that it was calculated to instill in the minds of the jurors a belief that Robert Nenert was covered by a policy of liability insurance.
The transcript shows that the court promptly sustained the objection to this argument interposed by counsel for Robert Nenert, and instructed the jury to disregard same. No request was made by Nenert's counsel for a mistrial, or that plaintiff's counsel be reprimanded. The matter was assigned as error in Nenert's motion for new trial, which motion was overruled.
Assuming that the argument was improper, we do not believe we are authorized to disturb the verdict and judgment for that reason, in view of the condition of the record. Had the trial court overruled the objection, or refused a motion for a mistrial, a different situation would be presented. We cannot convict the trial court of error *401 in its rulings which are not adverse to the party complaining.
It is urged by appellant Nenert that Instructions No. 2 and No. 3, given at plaintiff's request, were erroneous for the reason that the principles of law announced in said instructions conflict with and are directly contradictory to the principles of law set out in Instruction No. 7. Said Instruction No. 7 was given at the request of defendant Nenert. Instructions No. 2 and No. 3 submitted the case to the jury under the so-called humanitarian doctrine. Instruction No. 7 submitted the defense of contributory negligence. No instructions on primary negligence were given.
We find that the evidence justified the submission of the case to the jury on the humanitarian theory. It was, therefore, error to give Instruction No. 7. Contributory negligence is no defense to a humanitarian case. State ex rel. Kansas City Public Service Co. v. Shain et al., 343 Mo. 1066, 124 S.W.2d 1097; Gray v. Columbia Terminals Co. et al., 331 Mo. 73, 52 S.W. 2d 809; Bode v. Wells, 322 Mo. 386, 15 S. W.2d 335; Thompson v. Quincy, O. & K. C. R. Co., Mo.Sup., 18 S.W.2d 401; McGowan v. Wells, 324 Mo. 652, 24 S.W.2d 633; Pence v. Kansas City Laundry Service Co., 332 Mo. 930, 59 S.W.2d 633. The conflict complained of resulted from the giving of an erroneous instruction at Nenert's request. Such being the case, Nenert is in no position to complain. One cannot lead a court into error and them complain of it. Reardon v. Missouri Pac. R. Co., 114 Mo. 384, 21 S.W. 731; Hall v. Missouri Pac. R. Co., 219 Mo. 553, 118 S.W. 56; Williams v. Excavating & Foundation Co., 230 Mo.App. 973, 93 S.W.2d 123; Yontz v. Shernaman, Mo.App., 94 S.W.2d 917.
Appellant Nenert complains that the verdict of the jury is excessive. This necessitates a review of the medical testimony and other evidence touching this issue.
The accident occurred on Friday, October 10, 1947. Plaintiff received an injury to his head which caused him to suffer headaches for about two weeks; an injury to his back which was of short duration; and injury to his left knee. Dr. William F. McNamee, who treated plaintiff, diagnosed the latter injury as a "hydrarthrosis knee joint," commonly called "water on the knee," and testified that it was permanent in nature. Plaintiff called at Dr. McNamee's office for treatment on October 13. At that time, according to the doctor's testimony, plaintiff complained of pain in the lower back region and knee. He stated that the plaintiff's knee was swollen and tender at the time. The doctor administered heat treatments to the knee eight or nine times over a period of two weeks. Thereafter, the doctor saw plaintiff on several occasions when he treated other members of plaintiff's family. At those times plaintiff still complained of pain in the knee and Dr. McNamee recommended an elastic support for the knee. The doctor further testified that he last saw plaintiff in December, 1948, and that plaintiff was at that time still complaining of pain in the knee. Plaintiff's doctor bill was $55. The damage to plaintiff's car was estimated to be around $230. Plaintiff lost approximately six days from work. At the time of the trial, on January 19, 1949, plaintiff still complained of pain in the knee.
Defendants offered no medical evidence.
There is no accurate scale for measuring the money value of the damage sustained in cases of this character. Each case must be considered upon its own peculiar facts. We must also consider the evidence in a light most favorable to the plaintiff. Mickel v. Thompson, 348 Mo. 991, 156 S.W.2d 721; Peterson v. Kansas City, 324 Mo. 454, 23 S.W.2d 1045; Webb v. Missouri, Kansas & Texas R. Co., 342 Mo. 394, 116 S.W.2d 27; Biener v. St. Louis Public Serv. Co., Mo.App., 160 S.W.2d 780. And, while it is our duty to give due consideration to the principle that there should be reasonable uniformity for similar injuries, it is also our duty, when comparing awards for injuries allowed in previous similar cases, to take into consideration the changed economic conditions in recent years. Liles v. Associated Transports, Inc., Mo.Sup., 220 S.W.2d 36, loc.cit. 43. It is also a fundamental rule that the *402 appellate court should not disturb a verdict as excessive unless it appears that it is grossly excessive, and excessive to such an extent as to shock the conscience of the court. Mickel v. Thompson, 348 Mo. 991, 156 S.W.2d 721; Biener v. St. Louis Pub. Serv. Co., Mo.App., 160 S.W.2d 780; Rinderknecht v. Thompson, Mo.Sup., 220 S.W. 2d 69.
Bearing these rules in mind, we have carefully examined the evidence presented by the record and have concluded that the verdict was not one which calls for the interference of this court on the ground of excessiveness.
For the reasons above set out, the judgment against appellant Robert Nenert is affirmed. The judgment against appellants J. Rush James and Alma H. James is reversed.
HUGHES and McCULLEN, JJ., concur.