Larry **KARNES**, a minor, by his next friend, Lorraine Karnes (his mother and natural guardian) (Plaintiff), Respondent,

v.

**ACE CAB COMPANY, a corporation,** (Defendant), Appellant.

**No.** 29240.

St. Louis Court of Appeals.

Missouri.

Feb. 21, 1956.

Motion for Rehearing or for Transfer to Supreme Court Denied March 15, 1956.

Morris A. Shenker, William P. Byrne, St. Louis, for appellant.

Robert D. Bransford, St. Louis, for respondent.

HOUSER, Commissioner.

This is an action by 13-year old Larry Karnes against Ace Cab Company for damages for personal injuries allegedly sustained by plaintiff when his bicycle collided with one of defendant's taxicabs. Defendant appeals from a judgment rendered upon a jury verdict for plaintiff for $3,500, contending that instructions given the jury (1) improperly imposed the highest degree of care whereas only ordinary care was required of defendant under the circumstances, and (2) improperly injected a false issue, that of contributory negligence, thus misleading and confusing the jury; and that the verdict is excessive.

The petition, inter alia, charged that while defendant's taxicab was stopped on the east side of a public street in the City of St. Louis, headed north, its driver negligently opened the left front door of the taxicab into and against the path of plaintiff's bicycle at a time when plaintiff was in such close proximity that the driver of the taxicab knew or by the exercise of the highest degree of care should have known that there was danger of a collision, etc. Defendant's answer consisted of a general denial, coupled with a plea that "its said taxicab was parked and its driver was not in or near said taxicab and that whatever injuries, if any, plaintiff sustained were caused solely and directly as a result of his negligence and carelessness in falling or jumping from his said bicycle and onto the aforesaid street."

The collision occurred in front of Larry Davis' Food Shop at 1402 Tower Grove Avenue, to which address the taxicab had been driven to pick up a fare. The taxicab was stopped or parked on the east side of the street, headed north. Plaintiff, riding his bicycle and heading north, approached the taxicab from the rear. There were no cars parked to the south of the taxicab. The bicycle was proceeding about 2–3 feet west of the east curb. At a point 2 yards south of the rear of the taxicab plaintiff turned his bicycle to the left to go around it, and while passing the taxicab some 6–12 inches to the west of its left side the taxicab driver, in the process of getting out of the taxicab, opened its left front door from the inside, directly in plaintiff's path. The handle bars of the bicycle hit the door and plaintiff fell to the pavement. The taxicab driver got out of the taxicab after the collision. Plaintiff testified that prior to this occurrence, as he was crossing Hunt Avenue, he saw the taxicab stop "about a block up the street," so we must assume that at the time of the collision the taxicab had been stopped or parked for a very brief period of time. Apparently the taxicab was parallel to and parked in a proper position adjacent to the curb. There is no intimation that the taxicab was not properly parked. There was no testimony on the question whether the engine had been turned off or was still running at the time of the collision.

Having in mind Section 304.010 RSMo 1949, V.A.M.S.[1] the first question for determination is whether the driver's act of opening the left front door to alight from a motor vehicle, after properly parking it on a city street, is an act of *operating* or *driving* the vehicle.

Appellant contends that the statutory duty to exercise the highest degree of care extends only to the *driving* of, and not to the act of alighting from, a motor vehicle. This begs the question. No exceptions are provided for in § 304.010, supra, and nothing in the section indicates "that one in driving a motor vehicle, should be held to the highest degree of care in doing or failing to do some things, and only ordinary

1. "Every person operating a motor vehicle on the highways of this state shall drive the same in a careful and prudent man-
ner, and shall exercise the highest degree of care, * * *."

care in doing or in failing to do other things." Robinson v. Ross, Mo.App., 47 S.W.2d 122, loc. cit. 126. The question remains whether alighting from a motor vehicle is part and parcel of the operation or driving of the vehicle.

Appellant contends that the operation of an automobile signifies a personal act in working its mechanism; that the taxicab was not being driven or operated but was parked; that an automobile is not being operated or driven when it remains stationary and while no person is making an attempt to move it. The idea that an automobile must be in motion in order to be "operated" within the meaning of § 304.010, supra, (then § 19, p. 91, Laws of Missouri, 1921, First Extra Session) was rejected in Stewart v. Jeffries, 224 Mo.App. 1050, 34 S.W.2d 560, loc. cit. 562 wherein it was said:

"* * * and it would be too narrow a construction to attempt to say that while a motor vehicle was moving it was being operated, but the moment it stopped by reason of lack of gasoline, or by reason of defective spark plug, or a broken gas line, or from any other cause, it was not in operation, and that the person who had been driving and had gotten out from under the steering wheel, and was attempting to find the trouble was not its operator, and was not then engaged in operating it. * * *"

The same concept was reiterated in Taylor v. Silver King Oil & Gas Co., Mo.App., 203 S.W.2d 147, loc. cit. 154, as follows:

"In a legal sense the truck was being operated by the defendant whether it was stationary or moving. The word 'operation' is not limited to the movement of the car alone, but includes such stops as motor vehicles ordinarily make in the course of their operation. Berry on Automobiles, 4th Edition, Sec. 274; Babbitt on the Law Applied to Motor Vehicles, 3d Edition, Sec. 335."

In the Taylor case the vehicle had been stopped on the highway, its hood was up and its driver was working on the mechanism of the car at the time of the collision, according to the testimony of the prevailing party plaintiff. While the facts of the Stewart and Taylor cases, supra, differ from the facts in the instant case we see no logical distinction in the legal principles applicable. See also Maher v. Concannon, 56 R.I. 395, 185 A. 907; Cook v. Crowell, 273 Mass. 356, 173 N.E. 587; Stroud v. Water Com'rs of City of Hartford, 90 Conn. 412, 97 A. 336; Scheppmann v. Swennes, 172 Minn. 493, 215 N.W. 861; Hanser v. Youngs, 212 Mich. 508, 180 N.W. 409. If "operation" includes activity of the driver after leaving his stopped vehicle, *a fortiori* it includes his activity in the course of leaving (while alighting from) such vehicle. We construe the "operating" or "driving" of a motor vehicle within the meaning of § 304.010, supra, as encompassing all acts necessary to be performed in the movement of a motor vehicle from one place to another or fairly incidental to the ordinary course of its operation, including not only the act of stopping en route for purposes reasonably associated with the transit but also all acts which, in point of time and circumstance, are reasonably connected with entering the vehicle at the point of departure and alighting therefrom at destination. Stewart v. Jeffries, supra; Taylor v. Silver King Oil & Gas Co., supra; Southern Surety Co. v. Davidson, Tex.Civ.App., 280 S.W. 336; Lima Used Car Exchange v. Hemperly, 120 Ohio St. 400, 166 N.E. 364; Kennedy v. Consolidated Motor Lines, 312 Mass. 84, 43 N.E.2d 121. Accordingly, there was no error in giving Instructions Nos. 1, 2 and 4 imposing upon defendant the duty to exercise the highest degree of care and relating to the burden of proof in connection therewith.

Appellant's next point is that the court erred in giving Instructions Nos. 5 and 6 relating to contributory negligence, as requested by plaintiff. Instruction No. 5, a converse contributory negligence instruction, follows:

"The Court instructs the jury that you cannot find against the plaintiff on

the ground that the plaintiff was contributorily negligent unless you find that the negligence, if any, on the part of the plaintiff entered into and formed a direct, producing and efficient contributory cause of the casualty mentioned in evidence and absent which such casualty would not have occurred."

Instruction No. 6 laid the burden of proof of contributory negligence upon defendant, defined the burden, and directed the jury that they could not find against plaintiff on the issue of contributory negligence if defendant "has failed to carry such burden." Defendant did not offer and the court did not give any other instructions on the question of contributory negligence. Defendant contends that contributory negligence was not made an issue by the pleadings or evidence; that defendant contended that the accident was caused solely by plaintiff's falling or jumping from his bicycle and that defendant's taxicab driver had nothing to do with it because she was outside of the taxicab, standing on the sidewalk, when the incident occurred; that the injection of this issue was misleading and confusing and that the theory of the defense was thereby destroyed "thus imposing on the defendant after trial a burden it had chosen not to assume during trial." .

■ We agree that defendant's plea that any injuries sustained by plaintiff were caused solely and directly as a result of plaintiff's own negligence was not an affirmative plea of contributory negligence, since it makes plaintiff's negligence the sole cause of the injury. Such a plea merely denies plaintiff's cause of action. Janssens v. Thompson, 360 Mo. 351, 228 S.W. 2d 743; Lankford v. Thompson, 354 Mo. 220, 189 S.W.2d 217; Lanio v. Kansas City Public Service Co., Mo.Sup., 162 S.W. 2d 862; Smith v. Kansas City Public Serv-

ice Co., 328 Mo. 979, 43 S.W.2d 548. We further agree that contributory negligence was not made an issue by the manner in which the parties introduced evidence or tried the case.

■ We cannot agree, however, that defendant was prejudiced by the unnecessary injection of the issue of contributory negligence into the case. At least five cases[2] hold that the giving of instructions on contributory negligence in cases where that defense is not pleaded is harmless error of which the defendant has no right to complain, because it is made in his favor.

Defendant seeks to distinguish these cases on the ground that these are cases brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., that under the Act contributory negligence would not defeat recovery but should be considered by the jury only in diminution or reduction of damages, as a result of which the defendants in those cases could not have been prejudiced. Such a distinction is without substance. It is a difference in degree but not in principle. Defendant further points out that in the cited cases there was no essential dispute as to the manner in which the accident occurred whereas in the instant case there was a direct conflict in this respect. We cannot follow defendant in this attempt to differentiate. Under plaintiff's principal instruction he sought recovery on the theory that the fault was entirely that of defendant. Defendant's main instruction directed a verdict for it on the theory that the fault was entirely that of plaintiff. By necessary implication Instructions Nos. 5 and 6 presented defendant with a new, third possibility, namely, a verdict for defendant even though the jury found defendant negligent, if plaintiff was likewise negligent and the negligence of plaintiff entered into and formed a direct, producing and efficient

2. Spencer v. Quincy, O. & K. C. R. Co., 317 Mo. 492, 297 S.W. 353; State ex rel. Greer v. Cox, Mo.Sup., 274 S.W. 373; Alexander v. Barnes Grocery Co., 223 Mo.App. 1, 7 S.W.2d 370; Demaray v. Missouri-Kansas-Texas R. Co., 330 Mo. 589, 50 S.W.2d 127, certiorari denied Missouri-Kansas-Texas R. Co. v. Demaray, 287 U.S. 620, 53 S.Ct. 20, 77 L.Ed. 538; Schlueter v. East St. Louis Connecting R. Co., 316 Mo. 1266, 296 S.W. 105.

contributory cause of the casualty. Plaintiff took on and carried an unnecessary burden in favor of defendant, but this is "not error of which a defendant (so favored) may take advantage." Berry v. St. Louis, M. & S. E. R. Co., 214 Mo. 593, loc. cit. 604, 114 S.W. 27, loc. cit. 31.

■ The next question is whether the $3,500 verdict was excessive. When plaintiff's bicycle, traveling "about normal speed," struck the taxicab door the handle bar of the bicycle hit plaintiff's chest. When he fell from the bicycle he hit his head on the pavement. He was not rendered unconscious. Apparently his knees were scratched. He got up by himself and picked up his bicycle. He was "pretty dizzy." There was a lump on his head after the accident. He talked to various people at the scene of the accident, then went home for about 20 minutes. Later he returned to the scene of the accident and talked to the police. He went home a second time and went to bed. The next day he visited Dr. Robert Hall, who gave him two shots of penicillin and advised him to take aspirin. The doctor did not suspect skull fracture and did not cause X-rays of his head to be taken until 10 days thereafter. He was not hospitalized at any time. After coming home from the doctor's office plaintiff went to bed and stayed there all day. Dr. Hall's examination revealed a bruise and a blood clot somewhat larger than an inch in diameter over the left parietal area of the scalp and pain and tenderness over the eleventh and twelfth ribs on the right side. There was no bleeding from the ears, nose or mouth after the accident but plaintiff was complaining of some headache and dizziness at the time of his examination the next day. The rest of the examination, including an examination of the cranial nerves, was negative, as was a neurological examination. The subsequent X-rays were negative for fracture of the skull. The accident happened on May 18, 1953 and plaintiff did not return to school any more that spring after the accident. School closed about the middle of June. The following fall he missed an unspecified number of days of school because of sick headaches. Before the accident he did not suffer from headaches, but afterwards he had sick headaches three or four times a week. At trial time, September 21, 1954, he testified that he had headaches about once a week which lasted about a half a day, for which he took aspirin. The doctor's diagnosis was "cerebral concussion, post-traumatic, and contusion and blood clot, or hematoma, to the scalp, contusion to the left anterior chest and contusion to the right posterior chest." The doctor testified that in concussion of the brain there is ordinarily swelling, bruising, and possibly hemorrhage to the brain; that healing usually takes place by absorption of the blood clot, with scar tissue formation; that the formation of scar tissue is a permanent thing; that because of contraction or pressure on scar tissue in certain parts of the brain pain is caused which is ordinarily referred to as a "headache." He testified that since the accident plaintiff has persistently complained of recurrent frontal headaches which have occurred sometimes once or twice a week and sometimes every day, for 16 months, and that he is still complaining of headaches. The doctor gave his opinion that with reasonable medical certainty the headaches were the result of the accident and would probably continue in the future, but he could not predict how long they would persist or whether the condition would become worse. On cross-examination the doctor conceded that plaintiff had not sustained a severe concussion of the brain, and that he did not know whether there had been a blood clot within the brain itself. The doctor examined plaintiff three times in May, once in July and once in September. The doctor administered the Romberg test, tested his gait, cranial nerves and reflexes and "found nothing abnormal." He conceded that he had found none of "the things that we look for," such symptoms as blurring, vomiting, convulsions, nausea, confusion, slow weak pulse, etc., and that plaintiff's vision, hearing, facial muscles, walking and the functioning and sensitivity of the members of his body had

not been affected. He testified that "all he had to go on" in his examination was plaintiff's subjective complaint of headaches. He further testified positively that he found no evidence of traumatic neurosis.

Considered in the light most favorable to plaintiff this is a case of mild concussion with a complete recovery except for a residuum of headaches once a week which will "probably" continue into the future. How long they will continue is not predicted. There is no fracture, no hospitalization, no special damages, no permanent disabling effect. Plaintiff spent only one evening and one day in bed. None of the symptoms commonly found in cases where substantial damages have been awarded for brain damage, such as unconsciousness, bleeding, nausea, vomiting, contusions, nervousness, anxiety, depression, sleeplessness, paralysis, impairment of some or all of the five senses or of the central nervous system, interference with reflexes, gait, memory, etc., were present, except headaches for 16 months and dizziness on May 18 and 19, 1953. Plaintiff's doctor testified that he did not find the things doctors look for in concussion cases, and that this was not a serious concussion; that headaches might be caused by sinus trouble, fatigue or eye strain. No such serious injuries were sustained as in Lilly v. Kansas City Rys. Co., Mo.App., 209 S. W. 969, Schneider v. Silbergeld, Mo.App., 31 S.W.2d 267, and Larson v. Atchison, T. & S. F. Ry. Co., Mo.Sup., 261 S.W.2d 111, where recoveries of $4,000, $5,000 and $6,000, respectively, were permitted. In the instant case plaintiff was absent from school for four weeks after his injury but unimpeached testimony from school records showed considerable absenteeism prior to the date of his injury.

Plaintiff cites the cases of Scheidegger v. Thompson, Mo.App.1943, 174 S.W.2d 216; Webb v. Cox, Mo.App.1952, 53 S.W. 2d 1057; Hughes v. St. Louis Public Service Co., Mo.App.1952, 251 S.W.2d 360, and Mountana v. Nenert, Mo.App.1950, 226 S. W.2d 394, in which recoveries in the sums of $4,000, $5,000, $3,000 and $3,500, respectively, were allowed. A careful review

of each of these cases reveals considerably more serious injuries than those sustained by plaintiff in the instant case.

For the minor injuries revealed by this record it is evident that the judgment herein is excessive in the sum of at least $1,000 even in these days of inflation, judged by the rules reiterated in Arl v. St. Louis Public Service Co., Mo.App., 243 S.W.2d 797, and Schwinegruber v. St. Louis Public Service Co., Mo.App., 241 S.W.2d 782. See Roberts v. Carter, Mo.App., 234 S.W.2d 324, McBride v. Clarida, Mo.App., 254 S. W.2d 36, and Morris v. Alexander, Mo. App., 275 S.W.2d 373, where, in cases involving the same type but more serious injuries, judgments for $4,000, $5,000 and $4,500, respectively, were cut to $3,000. And compare Morris v. Alexander, supra, decided in January, 1955, in which a judgment for $4,500 was reduced to $3,000 by way of an order of remittitur where plaintiff sustained a fracture of the frontal bones of the skull, leaving a depressed area an inch and one-half in diameter protruding a quarter of an inch into the cranial cavity with a residuum of weakness of the left eye, headaches two or three times a week, nervousness and sleepnessness.

Your Commissioner recommends that if plaintiff will, within thirty days, remit the sum of $1,000 from the verdict of the jury in his favor, the judgment be reversed and the cause remanded with directions to the trial court to enter judgment in the reduced amount, to wit, $2,500, plus interest on $2,500 at six per cent from September 22, 1954 to the date of entry of the new judgment; and that otherwise the judgment be reversed and the cause be remanded for a new trial.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court, and pursuant to his recommendation, if plaintiff will, within thirty days, remit the sum of $1,000 from the verdict of the jury in his favor, the judgment will be reversed and the cause remanded with directions to the trial court to enter judgment in the

reduced amount, to wit, $2,500, plus interest on $2,500 at six per cent from September 22, 1954 to the date of entry of the new judgment; otherwise the judgment will be reversed and the cause remanded for a new trial.

ANDERSON, P. J., MATTHES, J., and SAM C. BLAIR, Special Judge, concur.